UNITED STATES of America

v.

Kevin F. WILLIAMS–DAVIS,
et al., Defendants.

Crim. Nos. 91–0559–01, 91–0559–02,
91–0559–04, 91–0559–06 and
91–0559–20 (GHR).

United States District Court,
District of Columbia.

April 27, 1993.

Russell D. Duncan, Odessa F. Vincent, Ann Rosenfield, Asst. U.S. Attys., Washington, DC, for U.S.

Leonard Birdsong, Carolyn Lerner, Kator, Scott & Heller, Washington, DC, for defendant Kevin Williams–Davis.

Kenneth M. Robinson, Jr., Washington, DC, for defendant Anthony Nugent.

Daniel Ellenbogen, Washington, DC, for defendant Alba D. Restrepo.

Gregory B. English, Alexandria, VA, for defendant Darryl D. Williams.

William J. Garber, Washington, DC, for defendant Joyce W. Boyd.

## OPINION AND ORDER

REVERCOMB, District Judge.

The Court has before it three post-verdict motions on behalf of defendants Kevin F. Williams–Davis, Anthony T. Nugent, Alba D. Restrepo, Darryl D. Williams, and Joyce W. Boyd. These motions are, respectively, 1) a Motion to Dismiss, Or in the Alternative, For New Trial, in which all five defendants join; 2) a Motion for New Trial, And/Or Judgment of Acquittal, N.O.V., filed by defendant Joyce W. Boyd; and 3) a Motion to Dismiss, filed by defendant Darryl D. Williams.[1] Each motion pertains to what has come to be known as the first "R Street trial."

## I. BACKGROUND

This trial grew out of a lengthy investigation of a drug trafficking conspiracy known as the "R Street Organization," which operated chiefly in northeast Washington, D.C., between 1983 and March 26, 1991. On September 25, 1991, a federal grand jury returned a 115–count superseding indictment

---

1. This Opinion and Order replaces an Order and Opinion previously issued on April 21, 1993, and vacated by the Court on its own motion on April 23, 1993.

naming 24 defendants as members of this conspiracy. The indictment charged each defendant with violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"), conspiracy to violate RICO, 18 U.S.C. § 1962(d), and drug conspiracy, 21 U.S.C. § 846. Four defendants—Kevin F. Williams–Davis, Anthony T. Nugent, Darryl Williams, and Jeffrey Williams—were also charged with operating a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848 *et seq.*, the so-called "drug kingpin" statute. Each defendant was also named in two asset-forfeiture counts. Finally, each defendant was charged with one or more substantive crimes, which included narcotics distribution, possession with intent to distribute narcotics, murder, armed robbery, money laundering, and various other offenses associated with drug trafficking.

The R Street case represented the first attempt by the United States Attorney to use federal racketeering laws against a neighborhood drug gang in the District of Columbia. The unprecedented use of RICO against so many defendants in a single indictment and the massive amount of evidence accumulated by the government guaranteed that any trial would be a lengthy one. The demands on the justice system in terms of cost and expenditure of time would be heavy.[2] To avoid some of the case management problems associated with "megatrials," the Court on December 13, 1991, severed the case into four trials.[3] After lengthy hearings on numerous pretrial motions, the first group of five defendants proceeded to trial in February, 1992. The Court conducted *voir dire* and impaneled a jury on February 18 and 19, 1992.

The first R Street trial proved not only lengthy, but acrimonious as well. Relations between several defense counsel and the lead prosecutor grew increasingly strained as the trial wore on. Counsel for Anthony Nugent in particular resorted almost daily to vitriolic attacks upon the integrity and professionalism of the government investigators and law enforcement officers, including the lead prosecutor in the case, the tone and decibel level of which are not fully reflected in the trial record. The lead prosecutor was occasionally provoked to respond in kind. Personality conflicts among certain members of the jury panel also surfaced at different times during the trial. When the jurors proved unable to resolve these conflicts, the Court, after consulting with all counsel on the record, obtaining their agreement, and interviewing the individual jurors in question, and as a last resort to avoid a mistrial, excused two members of the panel during the course of the trial. Other jurors had to be excused during the trial for medical or other personal reasons.

After a trial lasting over four months, the jury was instructed and began deliberations on July 6, 1992. Unanimous verdicts were returned on July 21, 1992, and July 23, 1992.[4] The jury acquitted on the RICO and RICO conspiracy counts and on several specific substantive counts, but otherwise convicted each of the five defendants of drug conspiracy and the other drug trafficking and money laundering counts with which he or she had been charged. In addition, defendants Kevin Williams–Davis, Anthony Nugent and Darryl Williams were convicted of the CCE violation alleged in Count 4 and of second-degree murder for the death of Leon Clea.[5] The jurors were individually polled and each assented to the verdicts as read by the foreperson.

## II. THE POST–VERDICT MOTION ON JURY CONTAMINATION

Before the jury was discharged, several defense counsel requested permission to

---

2. The costs in this case were not only those incurred by the government in choosing to go forward with a single, multi-defendant RICO prosecution against an entire gang. Each defendant in this case is represented by court-appointed counsel under the Criminal Justice Act.

3. The Court explained its reasons for so doing in a Memorandum and Order dated December 16, 1991.

4. The jury was instructed and deliberated separately on the asset forfeiture counts.

5. Defendants Nugent and Williams–Davis were also convicted of second-degree murder in the death of Francis Scrivner and of numerous counts of assault with intent to kill while armed in connection with the shoot-out at a Maryland Avenue auto repair shop in which Scrivner died.

speak to the jurors about the trial.[6] The Court responded by advising jurors that they were free not to speak to anyone about the trial if they chose but that there would be no prohibition on speaking either. *See* Tr. July 23, 1992, at 89. Defense counsel subsequently obtained affidavits from jurors Shalita Isaac, Wayne Scott, and Frank Garnett, and from alternate jurors Cheri Dews and Pearl Fleming.[7] This joint post-verdict motion followed.

Defendants seek a new trial on grounds of juror misconduct, which they allege was rife throughout the trial. As discussed in the conclusion below, the Court believes, on the basis of juror statements to the press after the trial, that these allegations of misconduct are motivated in no small measure by unease on the part of these jurors over the substantial sentences defendants are likely to receive if their convictions are upheld. Nevertheless, relying chiefly on allegations contained in the five juror affidavits, defendants claim that the following instances of misconduct occurred and irretrievably tainted the verdicts:

1) That the jurors read and discussed two articles in the Washington Post containing information about the R Street Organization not in evidence.

2) That, prior to deliberations, two jurors visited the R Street and Lincoln Road area, the site of many of the illegal acts at issue in this trial.

3) That one juror failed to disclose, in response to a question at the initial *voir dire*, that he had once lived in the R Street and Lincoln Road neighborhood.

4) That another juror, subsequently elected foreperson, failed to disclose, in response to a question at the initial *voir dire*, that she had a criminal record, verbally threatened and abused other jurors during deliberations, distorted communications between herself and the Court, and re-

fused to make inquiries requested by other jurors.

5) That this same juror engaged in a pre-deliberation "campaign" to have nonconforming jurors struck from the jury.

6) That the jury foreperson discussed the trial with her husband and conveyed to other jurors his view that the jury should "nail" the defendants and send them to jail.

7) That the jury foreperson took notes during the trial and consulted a dictionary for a definition of the word "enterprise," allegedly to convince other jurors that an enterprise existed.

8) That the Marshals blocked the requests of some jurors to inform the Court of their complaints about the foreperson and other jurors, and that improper communications otherwise occurred between the Marshals and the jurors.

9) That the jurors regularly discussed the case throughout the trial, contrary to the Court's repeated instructions.

10) That one juror was put in fear about the trial because she perceived that her home was under surveillance.

11) That, during deliberations, a sitting juror discussed with an alternate the foreperson's views of the RICO charges, his own attempts to contact the Court, and the alternate's views of forfeiture.

12) That the Court committed error in dismissing, on medical grounds, a sitting juror against his will after deliberations began and at a time when the jury was alleged deadlocked on defendants' guilt.

The Court will review each of these allegations below. Before doing so, however, it is important to recall the general principles that guide post-verdict inquiries into allegations of jury misconduct.

---

6. The issue arose in the context of the Washington Post's application for an order regarding post-trial communications with jurors. The government took no position on either Post's application or the request of defense counsel to speak with the jurors after the trial.

7. Of these four, only Frank Garnett remained on the jury during its entire deliberations. Wayne Scott was excused for medical reasons during deliberations, but before verdicts were returned, as will be discussed in greater detail below. Shalita Isaac, Cheri Dews, and Pearl Fleming were excused prior to deliberations.

## A. Scope of the Inquiry

■ Post-verdict inquiries into juror misconduct must balance the defendant's Sixth Amendment right to a fair trial by an impartial jury with the long-established policy, rooted in the common law, prohibiting the admission of juror testimony to impeach a jury verdict. *See Tanner v. United States,* 483 U.S. 107, 117–27, 107 S.Ct. 2739, 2746–51, 97 L.Ed.2d 90 (1987). Among the purposes for this strong policy are the promotion of finality of jury verdicts, the discouragement of harassment of jurors, the reduction of incentives for jury tampering, and the encouragement of free and open discussion among jurors. *See id.* at 119–20, 107 S.Ct. at 2747–48; *United States v. Brooks,* 677 F.2d 907, 913–24 (D.C.Cir.1982) (*per curiam*); *Government of the Virgin Islands v. Gereau,* 523 F.2d 140, 148 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).

In adopting Fed.R.Evid. 606(b), Congress struck the balance by limiting juror testimony about the validity of a verdict to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Fed. R.Evid. 606(b); *see also Tanner,* 483 U.S. at 121–25, 107 S.Ct. at 2748–50 (reviewing in detail the legislative history of Rule 606(b) and noting that Congress considered and rejected broader versions of the Rule).[8] As our court of appeals has explained, this Rule aims "to preserve the integrity of jury deliberations by confining claims of error to events or conditions that are "*improperly* brought to the jury's attention" and involve a calculated, intentional attempt to affect their outcome." *Brooks,* 677 F.2d at 913–14 (citing 3 J. Weinstein & M. Berger, *Weinstein's*

*Evidence* § 606[03] (1981)). In determining what is an "extraneous influence" that would fall within Rule 606(b)'s exception, this Circuit has followed the Third Circuit's guidance:

"Extraneous influence" has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of defendant and his counsel. By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict.

*Gereau,* 523 F.2d at 149–50 (citations omitted); *see also United States v. Campbell,* 684 F.2d 141, 151 (D.C.Cir.1982) (quoting this passage from *Gereau* ) *United States v. Wilson,* 534 F.2d 375, 378–79 (D.C.Cir.1976) (same).

■ Thus, to impeach a jury verdict, a defendant must first establish the existence of adequate grounds to attack the verdict and come forward with competent evidence with which to do so. *See Gereau,* 523 F.2d at 148. Even if these burdens are met, however, the defendant is not entitled to a new trial unless there is some further showing of prejudice from the misconduct of the jury. *See United States v. Boylan,* 898 F.2d 230, 258 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990); *United States v. Bruscino,* 687 F.2d 938, 940 (7th Cir.1982) (*en banc* ), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983), *and cert. denied,* 459 U.S. 1228, 103 S.Ct. 1235, 75 L.Ed.2d 468 (1983); *Brooks,* 677 F.2d at 913;. *Gereau,* 523

---

8. Rule 606(b) states:

 **(b) Inquiry into validity of verdict or indictment.**

 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that

a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any jury. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

F.2d at 148. As Judge Henry Friendly put it in a seminal opinion:

> The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a "witness" and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice.

*United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971).

When jurors have been exposed to extraneous material, the legal standard to be applied is whether there is a "reasonable possibility" that such material could have affected the verdict. *See United States v. Ortiz*, 942 F.2d 903, 913 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2966, 119 L.Ed.2d 587 (1992); *United States v. Maree*, 934 F.2d 196, 201 (9th Cir.1991); *Bruscino*, 687 F.2d at 940; *accord Campbell*, 684 F.2d at 151 (stating that a jury verdict will be upset only when "extraneous influences" . . . *may* have improperly influenced the verdict" (emphasis added)). When the misconduct concerns juror dishonesty or an *ex parte* contact, a heightened standard applies and a new trial will be granted only upon a finding of "actual bias" or "actual prejudice" to the defendant. *See Smith v. Phillips*, 455 U.S. 209, 215–17, 102 S.Ct. 940, 945–46, 71 L.Ed.2d 78 (1982); *United States v. Boney*, 977 F.2d 624, 634 (D.C.Cir.1992); *Maree*, 934 F.2d at 201 (citing *United States v. Madrid*, 842 F.2d 1090, 1093 (9th Cir.), *cert. denied*, 488 U.S. 912, 109 S.Ct. 269, 102 L.Ed.2d 256, 257 (1988)). Once these initial determinations have been made, it is the government's burden to rebut the showing of prejudice by demonstrating that the misconduct was harmless to the defendant. '*See Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) [*Remmer I*]; *Butler*, 822 F.2d at 1195 & n. 2. ·

District courts have broad discretion in selecting the appropriate procedures to determine whether colorable allegations of juror misconduct have been made and, if so,

whether the requisite showing of prejudice has been met. *See Boylan*, 898 F.2d at 258; *United States v. Butler*, 822 F.2d 1191, 1196 (D.C.Cir.1987); *Campbell*, 684 F.2d at 151. The judge may, but need not, hold a full evidentiary hearing. *See Smith v. Phillips*, 455 U.S. 209, 216–18, 102 S.Ct. 940, 945–47, 71 L.Ed.2d 78 (1981); *Boylan*, 898 F.2d at 258–59; *Butler*, 822 F.2d at 1196. Should a hearing be appropriate, the judge may, but need not, question all the jurors. *Compare Boylan*, 898 F.2d at 259 (all jurors interviewed) *with United States v. Moon*, 718 F.2d 1210, 1233 (2nd Cir.1983) (citations omitted), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984) (only five jurors interviewed). The trial judge may, but need not, permit counsel to question and cross-examine jurors. *Compare United States v. Ianniello*, 740 F.Supp. 171, 180 (S.D.N.Y.) (Judge permitted defense counsel to question jurors at post-verdict hearing), *rev'd on other grounds*, 937 F.2d 797 (2nd Cir.1991) *with Boylan*, 898 F.2d at 259 (Judge did not permit direct attorney questioning at the hearing) *and United States v. Caro–Quintero*, 769 F.Supp. 1564, 1570 (C.D.Cal.1991) (same). The trial judge need not hold a hearing at all when there is no "clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *Moon*, 718 F.2d at 1234; *accord United States v. Sanders*, 962 F.2d 660, 669, 673–74 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 262, 121 L.Ed.2d 192 (1992); *Ortiz*, 942 F.2d at 912–13; *Campbell*, 684 F.2d at 151. In short, "[i]n these and other aspects of this problem the trial judge has broad discretion to fix the exact procedures by balancing the need to make a sufficient inquiry against the concern that the inquiry not create prejudicial effects by unduly magnifying the importance of an insignificant occurrence." *Butler*, 822 F.2d at 1196.

After reviewing defendants' joint motion and the government's opposition, the Court concluded that further investigation was required on several allegations of misconduct. These allegations, which will be discussed in greater detail below, were that the jury fore-

person's husband had made statements to her about the defendants' guilt which she then relayed to other jurors, that another juror failed to disclose his familiarity with the R Street and Lincoln Road area at the initial *voir dire,* and that the same juror had visited that area with an alternate juror at some point during the trial. The Court held a hearing, in the presence of all counsel and the five defendants, on March 29, 1993, at which the two jurors in question, Janet Jellison (the foreperson) and Carl Biggs testified under oath. In its Order to counsel scheduling the hearing, filed March 9, 1993 and subsequently amended, the Court gave notice of the procedures it intended to follow and which it did follow: the hearing was to be an evidentiary hearing limited to the specific allegations mentioned above concerning these individual jurors; counsel and defendants were to be present but would not be permitted to question the jurors; counsel were permitted, however, to submit questions in advance for the Court to ask, many of which the Court did ask; and counsel would be permitted to make arguments and objections only after the jurors were excused. The Court believed then, and believes now, that a full-blown, evidentiary hearing, in which all the jurors would be examined by counsel and subject to cross-examination, is unnecessary in view of the specific allegations of misconduct raised by defendants, would only lead to juror harassment, and would risk the creation of "prejudicial effects by unduly magnifying the importance of ... insignificant occurrence[s]." *Id.* The Court accordingly overruled the objections of defense counsel as to the hearing's scope and procedures.

Viewed in light of Rule 606(b) and related case law, the various allegations of misconduct contained in the juror affidavits can be grouped into five categories and analyzed accordingly. The Court will first consider those allegations that the jurors were exposed to extraneous material or information prejudicial to defendants.

### B. Alleged Exposure to Prejudicial Extraneous Material

#### 1. Juror Exposure to Media Coverage of the Trial

The first R Street trial [9] attracted considerable attention in the local media. The Court regularly warned jurors as a group not to read, listen to, or watch reports about the proceedings and, when necessary, conducted individual *voir dire* of them after reports about the trial appeared. Nevertheless, defendants contend that two articles in the Washington Post injected extraneous prejudicial information into the deliberative process, prompting the jurors to fear for their safety and thereby improperly influencing the verdict.

The first of these articles, which the Post published on its front page on March 13, 1992, reported that two prosecution witnesses had received death threats and that rambling, unsigned notices had been posted on telephone poles near R Street and Lincoln road warning other potential witnesses against "snitching." [10] The article ran a photograph of the notices and reported that they had been quickly removed from the telephone poles by agents from the Federal Bureau of Investigation ("FBI").

Shortly after the jurors assembled that morning, the Court undertook the following measures. *See* Tr. Mar. 13, 1992 (Sealed Portion).[11] First, the jury room was inspected by the Marshals to ascertain if there were any copies of that day's edition of the Post present (there were not). Next, the Court

---

9. While the instant post-verdict motions were pending, a second trial of six defendants associated with the R Street Organization, lasting approximately four months, concluded. *United States v. Andre Williams, et al.,* Crim. No. 91–0559–09.

10. Michael York, *Witness Threats Reported In R Street Drug Trial,* Washington Post, Mar. 13, 1992, at A1.

11. Prior to the Court's taking these measures, defense counsel moved for a hearing on how the press learned of these notices and for a mistrial. *See* Tr. Mar. 13, 1992, at 3–18. After hearing from all counsel, receiving information from the government on the provenance of the Post article, and interviewing each juror and alternate individually, the Court denied these motions from the bench on March 16, 1992. *See* Tr. Mar. 16, 1992, at 1.

conducted a *voir dire* of each juror individually at the bench. The Court asked each juror whether he or she had read or heard any recent reports about the trial. Most said they had not. Two jurors indicated they had heard a report about threats and the Court questioned them closely about what they had heard. In response to the Court's inquiries, both jurors stated that the reports would not affect their ability to be fair and impartial and that they would disregard what they had heard. All jurors were asked whether they would continue to avoid press reports about the trial and all indicated they would. All jurors were asked if they would base their verdict solely upon witnesses heard in the courtroom and the exhibits admitted into evidence and all indicated that they would.

On May 18, 1992, the Washington Post ran a story on its front page with the headline "Enforcers Are D.C.'s Dealers of Death," which defendants also claim tainted the jury's verdict. This article was not about the R Street Organization as such, but rather focused in general on turf battles between rival drug gangs and the role of drug gangs in the city's homicide rate.[12] The article, however, did mention defendant Anthony Nugent by name and alluded to three other defendants in this case as examples of "enforcers" who had allegedly committed homicides to advance their drug trafficking activities. The specific references to R Street defendants appeared in one paragraph on page A6 and summarized, in the most general terms, allegations that had already been made in open court and in the indictment.

That morning, before the trial resumed, counsel for Mr. Nugent addressed the Court in detail about the Post article and moved for a mistrial, in which three other defendants joined. *See* Tr. May 18, 1992, at 2–9. Once again, the Court conducted *voir dire* at the bench in the presence of one of the prosecutors and one of the defense counsel. Each juror was brought in individually and asked whether he or she had heard or read anything recently which they related in any way

to the trial. None stated that he or she had. Once again, the Court asked each juror if he or she would continue to avoid reading or hearing reports about the case and would base the verdict solely upon the evidence admitted at trial. Each said that he or she would. After the last juror returned to the jury room, the Court stated on the record that it accepted the jurors' statements that they had seen nothing in the press about the trial. The Court then denied the motion for a mistrial. *See id.* at 17–19. When the jury was subsequently brought into the courtroom, but before trial resumed, the Court advised them as a group that should any of them inadvertently see or hear anything that they would relate to the trial, they should bring it to the Court's attention. *See id.* at 24.

■ The five juror affidavits on which defendants rely contain statements claiming that the jurors read and discussed these articles notwithstanding their denials to the Court. However, only one affiant, Frank Garnett, claims to have read either of the two Post articles himself, in sharp contrast to his *voir dire* responses at the time the articles appeared. *See* Garnett Aff. ¶¶ 3, 5. Alternate jurors Dews and Fleming and jurors Isaac and Scott claim only that others read and discussed the articles in question. *See* Dews Aff. ¶ 3; Fleming Aff. ¶ 5; Isaac Aff. ¶ 3; Scott Aff. ¶ 3.

The Court does not believe that the jurors' declarations on this issue meet the evidentiary burdens to warrant either further inquiry by the Court or a finding that the articles could have affected the verdict. First, the Court finds credible the jurors' individual responses to its *voir dire* questions. The Court conducted individual *voir dire* promptly after the publication or airing of the stories in question and well before counsel had the opportunity to approach individual jurors about the trial.[13] The Court observed the demeanor of each juror closely at the time and is satisfied that each answered truthfully. Indeed, the Court attaches great weight

---

12. Pierre Thomas & Michael York, *Enforcers Are D.C.'s Dealers of Death,* Washington Post, May 18, 1992, at A1.

13. The Court also reiterated in its final instructions that the jurors were to disregard, as not in evidence, anything they had seen or heard outside the courtroom. *See* Tr. July 6, 1992, at 23.

to each juror's unequivocal assurances, made in response to repeated and direct questions from the Court, that he or she would rely solely on the evidence at trial in reaching a verdict. For the reasons set forth in the conclusion below, the Court views as particularly unreliable juror Garnett's statements to the contrary in his affidavit. *See* Garnett Aff. ¶ 3, 5. It should be noted that courts have found individual *voir dire* to be "the preferred method to determine 'what extra-record information was conveyed [to the jury] and the manner of its conveyance.'" *United States v. Small*, 891 F.2d 53, 56 (3d Cir.1989) (quoting *Government of the Virgin Islands v. Dowling*, 814 F.2d 134, 139–40 (3d Cir.1987)); *see also Caro–Quintero*, 769 F.Supp. at 1573 (finding juror's individual *voir dire* statements to be more credible than his post-verdict declarations).

Second, neither article contained extraneous, extra-judicial information about defendants that could have prejudiced their right to a fair trial. The March 13, 1992 Washington Post article would have told the jurors nothing about defendants that they hadn't learned already from the testimony of Rosalind Cherry and other witnesses or from the prosecutor's opening statement.[14] Moreover, the article does not suggest that *defendants* were the source of the alleged threats to witnesses and prospective witnesses. Prior to the publication of the May 18, 1992 Washington Post article, the jury had heard extensive testimony about the involvement of Anthony Nugent, Kevin Williams–Davis and Darryl Williams in the shooting death of Alton Clea. They had heard the prosecutor and other witnesses characterize the fight that led up to the killing of Mr. Clea as having arisen over a "turf" dispute between defendants and a rival drug gang. The jurors had also heard the government's allegations that the 1989 shoot-out at the Maryland Avenue auto body shop owned by Rick Bai-

ley, involving Anthony Nugent and Kevin Williams–Davis and resulting in the death of Francis Scrivner and the wounding of others, was in retaliation for the death of Mr. Nugent's brother Sean Martin and a result of an ongoing turf battle in the drug trade between the R Street Organization and a rival drug gang allegedly led by members of the Bailey family. Contrary to defendants' assertion in their Motion, the May 18 article does not say that Mr. Nugent was a suspect in three additional murders unconnected with the R Street trial, but rather states that he was "a suspect in three other attempted killings," as indicated in the indictment[15] and the prosecutor's opening statements concerning the Maryland Avenue shoot-out. Washington Post, May 18, 1992, at A6.

In short, neither of these articles contained "'massively inflammatory revelations of prior felony convictions, past criminal conduct, [or] admitted and alleged improprieties' typical of news accounts deemed to be prejudicial." *United States v. Boylan*, 698 F.Supp. 376, 389–90 (D.Mass.1988) (quoting *United States v. Solomon*, 422 F.2d 1110, 1117 (7th Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970)), *aff'd*, 898 F.2d 230 (1st Cir.1990); *see also Dowling*, 814 F.2d at 138 ("Information about prior criminal convictions or activities is the kind of information that carries great potential for prejudicing the jury"). The focus of the March 13 article concerned no issues that were material to defendants' guilt or innocence. *See United States v. Angiulo*, 897 F.2d 1169, 1185 (1st Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). "To resort to the metaphor that the moment a juror passes a fraction of an inch beyond the record evidence, he becomes 'an unsworn witness' is to ignore centuries of history [of the trial jury] and assume an answer rather than to provide the basis for one." *McMann*, 435 F.2d at

---

**14.** For example, on March 12, 1992, Rosalind Cherry testified extensively about the involvement of her late boyfriend, Odenga Dyson, with the drug-related activities of defendants Nugent and Williams–Davis. *See* Tr. March 12, 1992, at 40, 49–50, 52, 55, 58, 61–63, and 69–72. She also provided corroborating testimony as to Anthony Nugent's involvement in the Maryland Avenue shoot-out with the rival Bailey gang. *See id.* at 47–49. The Post article reported these

aspects of her March 12 testimony the next day. *See* Washington Post, Mar. 13, 1992, at A1.

**15.** Mr. Nugent was charged with seven counts of assault with intent to kill while armed arising from this incident, in addition to the first-degree murder charge in connection with the death of Francis Scrivner.

817. What little extra-judicial information each article did contain about defendants was merely duplicative of evidence already introduced in open court: Exposure to such information, when it occurs, has been found by a number of courts of appeals, including ours, to be harmless. *See Hughes v. Borg,* 898 F.2d 695, 700 (9th Cir.1990); *Frank v. Brookhart,* 877 F.2d 671, 675 (8th Cir.1989), *cert. denied,* 493 U.S. 1027, 110 S.Ct. 736, 107 L.Ed.2d 754 (1990); *United States v. Guida,* 792 F.2d 1087, 1094 (11th Cir.1987); *United States v. Treadwell,* 760 F.2d 327, 339 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).

■ Third, the statements in each affidavit [16] that jurors became fearful as a result of reading these articles or for other reasons fall squarely within Rule 606(b)'s prohibition on juror testimony that purports to describe each juror's subjective state of mind or emotions. *See Brooks,* 677 F.2d at 913 (Rule 606(b) bars jurors from testifying about the subjective effects that outside influences may have had upon them). These statements are thus inadmissible.

For the foregoing reasons, therefore, the Court does not believe that the likelihood of prejudice has been shown so as to shift the burden to the government to establish harmlessness. *See Remmer v. United States,* 350 U.S. 377, 379–80, 76 S.Ct. 425, 426–27, 100 L.Ed. 435 (1956) [*Remmer II*] (Finding a presumption of prejudice based upon "the paucity of information relating to the entire situation" and the "kind of facts alleged," i.e., a bribe); *Boylan,* 898 F.2d at 260 (Applying *Remmer* to different kinds of facts and finding no presumption of prejudice). Even if a showing of prejudice could be found on the facts as alleged, however, the Court believes that the government has established harmlessness based upon the content of the articles as discussed above and the overwhelming weight of the evidence against defendants. *See Caro–Quintero,* 769 F.Supp. at 1574 (citing *Hughes,* 898 F.2d at 700). In view of these considerations, the Court is satisfied that the procedures it employed were sufficient and that no post-verdict hear-

ing on media coverage during the trial is warranted.

### 2. *Juror Use of a Dictionary*

In their joint motion, defendants recite numerous instances of alleged misconduct by the jury foreperson, most of which will be discussed later in this Opinion. One alleged instance of misconduct, however, should be mentioned here. Relying on the affidavit of juror Frank Garnett, defendants claim that, during deliberations, the foreperson consulted a dictionary definition of the term "enterprise" and read that definition to the other jurors to convince them that an enterprise existed. *See* Defs.' Mot. at 20; Garnett Aff. ¶ 14.

■ A jury's unauthorized use of a dictionary is error, but it is not prejudicial *per se. See United States v. Griffith,* 756 F.2d 1244, 1251 (6th Cir.) (citing *United States v. Duncan,* 598 F.2d 839, 866 (4th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979)), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985). Unlike the situation in which jurors improperly consider facts or materials not in evidence, in this instance "the danger [is] that jurors will use the dictionary to construct their own definitions of legal terms which do not accurately or fairly reflect applicable law." *United States v. Birges,* 723 F.2d 666, 671 (9th Cir.), *cert. denied,* 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984), *and cert. denied,* 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 (1988); *see also United States v. Cheyenne,* 855 F.2d 566, 568 (8th Cir.1988) (stating that the use of a dictionary impinges on the court's function at trial and that therefore "it remains within the province of the judge to determine whether this conduct distorted the jury's understanding of the law to the prejudice of the defendant"). Although the Court can find no case in this circuit discussing juror use of a dictionary, there is no reason to think that our court of appeals would apply a standard at variance from those courts of appeals which have considered the problem. *See Treadwell,* 760 F.2d at 339 (citing *Dallago v. United States,* 427 F.2d 546, 553, 560 (D.C.Cir.1969)).

---

**16.** *See* Dews Aff. ¶ 4; Fleming Aff. ¶ 6; Isaac Aff. ¶ 4; Scott Aff. ¶¶ 3, 4; Garnett Aff. ¶¶ 2, 5, 8, 9.

■ In deciding whether to uphold a trial court's determination on the issue of prejudice, therefore, courts in review have paid careful attention to the entire circumstances surrounding the disclosure that a juror or jurors may have considered dictionary definitions of terms during deliberations, including the legal significance of the terms in question. *See, e.g., United States v. Turner,* 936 F.2d 221, 226 (6th Cir.1991) (jurors may have looked up "manager," "organizer," and "supervisor" during deliberations resulting in convictions for conspiracy to import and distribute cocaine and aiding and abetting in the importation of cocaine); *Cheyenne,* 855 F.2d at 567–68 (jurors looked up "callous" and "wanton" during deliberations resulting in conviction for second-degree murder); *Griffith,* 756 F.2d at 1250–51 (jurors looked up "organization" and "organize" during deliberations resulting in conviction for CCE); *Duncan,* 598 F.2d at 866 (jurors looked up "motive" and "intent" during deliberations resulting in conviction for electronic eavesdropping in violation of 18 U.S.C. § 2511(1)(b), conspiracy and misapplication of bank funds). In this instance, determination of the legal significance of the term in question disposes of the question of prejudice.

■ There was no prejudice to defendants because the jury acquitted them on the only charges for which the term "enterprise" was legally significant. Both RICO and RICO conspiracy require proof of the existence of an "enterprise" and the term is expressly defined by statute. *See* 18 U.S.C. § 1961(4). The Court instructed the jury on the statutory definition of "enterprise" while instructing them on the first element of a RICO offense under 18 U.S.C. § 1962(c). *See* Tr. July 6, 1992, at 46. The Court referred the jury to this definition in its instructions on RICO conspiracy. *See id.* at 69. Whether a dictionary definition of the term was at variance with the statute or not became moot once the jury acquitted the four defendants of RICO and RICO conspiracy.[17]

In contrast, "enterprise" is not a legally significant term in connection with the CCE charges against defendants Nugent, Williams–Davis and Darryl Williams on which the jury returned guilty verdicts. Although the statute codified at 21 U.S.C. § 848 is titled "continuing criminal enterprise," it has no "enterprise" element and the jurors were given no instructions that they had to find that a separate enterprise as such existed. *See* Tr. July 6, 1992, at 87, 92. Rather, the jurors were instructed *inter alia* that they had to find beyond a reasonable doubt that each of the defendants charged in the CCE count committed a "continuing series of violations" of federal drug laws that included the drug conspiracy charged in Count Three. The jury verdict forms clearly indicate that the jurors found such a series of violations. Thus, "enterprise" is simply not a legal term when considered in the context of a CCE charge and juror consideration of a dictionary definition of that word does not implicate the dangers usually associated with this form of juror misconduct. Accordingly, the Court can find no prejudice to defendants on this issue.

3. *Unauthorized Inspection of the R Street and Lincoln Road Areas*

The final credible allegation of juror exposure to extraneous material is found in the affidavit of Shalita Isaac. She states as follows:

> ... Around the second month of trial, Carl [Biggs] drove me to R Street, P Street and around to where Rayful Edmond sold his drugs because I didn't know where it was at. Carl used to live in 11 R Street. As we drove, he would say this is where Kevin [Williams–Davis] used to live, this is where [Anthony] Nugent used to live. Carl could place their faces from growing up on R Street.

Isaac Aff. ¶ 12. The references to P Street and Rayful Edmond pertain to other drug organizations or conspiracies not involved in this trial. Nevertheless, the statement raises two kinds of concerns about the jury which the Court believed required further investigation: Whether, during the trial, two jurors visited an area of Washington, D.C. in which many of the criminal acts that were the subject of the trial were alleged to have

17. The Court had previously dismissed those counts against defendant Joyce W. Boyd.

occurred; and whether juror Biggs failed to disclose his familiarity with the R Street and Lincoln Road area at *voir dire* during jury selection. The first concern goes to whether these jurors were exposed to prejudicial extraneous information about the defendants and will be addressed here; the second goes to juror bias and will be discussed later. Both concerns involving juror Biggs were the subjects of inquiry at the March 29 hearing.

Drawing on questions previously submitted by counsel and the Court's own questions, the Court had the following exchange with juror Biggs about the allegation that he and juror Isaac had visited an area where many of the crimes in the first trial were alleged to have taken place:

Q. Mr. Biggs, after your selection as a juror in this case, did you at any time go to the R Street neighborhood or Lincoln Road neighborhood?

A. Yes.

Q. When did you visit the area and did you visit it with one of the other jurors sitting in the case?

A. One evening after leaving court, I was taking one of the jurors which was Shalita Issacs [*sic*], we were out riding, and I took her all over D.C. I was out riding that evening, and we stopped and had food and I took her home.

Q. Did you visit the Lincoln Road and R Street area at that time?

A. Yes, we rode through the area.

Q. Did you visit the area on more than one occasion?

A. No.

Q. To the extent that you can, what were your reasons for visiting the R Street area with another juror during the trial?

A. She wanted me to take her out in D.C. and r[ide]. She wanted me to go out with her that evening after leaving court so I dropped her off home afterwards.

Q. Do you believe that your—and I'll ask you this again—do you believe that your visit to the R Street neighborhood during the trial had any negative or adverse effect on your ability as a juror to render a fair and impartial verdict?

A. No.

Q. Do you believe, notwithstanding your visit to the R Street neighborhood, that you were able to follow the court's instructions and to base your verdict on the evidence and the court's instructions?

A. Yes.

Q. What was your conversation with the other juror during your ride through that area?

A. I told her, I said I'm taking you for a ride this evening and I will drop you off at home. Do not go into these areas because when I first came to this area, Washington area, my cousin instructed me on the days that I was off not to be in certain areas of D.C.

Hearing Tr. Mar. 29, 1993, at 10–12. Having observed his demeanor during this colloquy, the Court found Mr. Biggs to be a credible witness.

■ Although there are few published decisions analyzing unauthorized visits by jurors to the scene of the crime, this species of misconduct plainly falls in the category of exposure to extraneous information and should be analyzed accordingly. Defendants having shown that error of this kind occurred, the Court must determine whether there is a reasonable possibility that juror Biggs's visit could have improperly influenced the verdict. *See Campbell,* 684 F.2d at 151; *Caro–Quintero,* 769 F.Supp. at 1574.

The Court is satisfied that there is no such possibility of prejudice to defendants from this incident. The incident consisted of a single visit by two jurors to the R Street and Lincoln Road area during the course of a long trial. The visit consisted of a "ride through" the area during an evening's outing "all over D.C." that included a stop for a meal. Ms. Isaac's affidavit indicates that Mr. Biggs did nothing more than point out where individual defendants lived as they drove through the neighborhood. There is no evidence that they conducted their own investigation to test the credibility of key witnesses or reenacted any of the crimes they had heard about during the trial. *See Hill v. United States,* 622 A.2d 680 (D.C. Mar. 30, 1993) (holding that a juror's visit to scene of crime to make his own test of lighting condi-

tions bearing on reliability of a police officer's identification of defendant tainted the verdict); *People v. Brown*, 48 N.Y.2d 388, 423 N.Y.S.2d 461, 463, 399 N.E.2d 51, 53 (1979) (discussing cases in which the jurors had engaged in similar conduct or reenactments, which were deemed inherently prejudicial). Given that, during the trial, the jurors had repeatedly viewed enlargements of aerial photographs and street photographs of R Street as it appears today, it is hard to see how they could have learned any new, material fact potentially prejudicial to defendants from simply driving down the street.

The Court does not accept defense counsel's characterization of Mr. Biggs's concluding comment about not going into "certain areas of D.C." as reflecting bias toward defendants, *see* Hearing Tr. Mar. 29, 1993, at 27, especially in view of his testimony that his visit to the area did not adversely affect his ability to be fair and impartial and that he was able to base his verdict on the evidence and the court's instructions. "[S]uch testimony is *not* 'inherently suspect.'" *Butler*, 822 F.2d at 1197 (quoting *Smith v. Phillips*, 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7) (emphasis in original). As for Ms. Isaac, she was later excused from the jury and did not deliberate. In short, the Court discerns no likelihood of prejudice to defendants from this incident.

### 4. Juror Discussions of the Trial Prior To Deliberations

 The juror affidavits indicate that, contrary to the Court's repeated instructions, the jurors frequently discussed the case during the trial. *See* Dews Aff. ¶ 6; Fleming Aff. ¶ 2; Isaac Aff. ¶¶ 3, 5, 8; Garnett Aff. ¶ 10; Scott Aff. ¶ 5. Defendants argue prejudicial error from these discussions under the rubric of consideration of extra-judicial information. *See* Defs.' Mem. at 13–15. Yet, with one exception, the portions of the affidavits devoted to these discussions refer to no specific extra-judicial information material to defendants' guilt or innocence.

The exception is the reference in juror Isaac's affidavit to a Washington Post article

published April 23, 1992. The article was concerned solely with the previous day's testimony about defendants' spending habits and lifestyles, and included testimony about a pair of alligator shoes costing approximately $2,000 which were suggested to have belonged to Kevin Williams–Davis.[18] The contents of the article are merely duplicative of evidence previously presented at trial. Because no prejudice could have occurred from this newspaper article, and because the Court was concerned not to magnify the importance in jurors' minds of news accounts that merely repeated in a neutral way what had been previously stated or entered into evidence in open court, no *voir dire* was conducted after the publication of the article and no further investigation is necessary.

Otherwise, the affidavits clearly indicate that what the jurors talked about during breaks and on other occasions during the trial was based on what they observed in court. Defendants nevertheless argue that such conversations, within the jury itself, constitute "improper, extraneous influence" by one juror over another. *See* Defs.' Mem. at 14. It should be noted that defendants do not cite a single case in support of this proposition. Our court of appeals has firmly rejected the argument that evidence of intra-jury discussions or pressure is admissible as an extraneous influence under the exception to Rule 606(b): "[E]vidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict." *Campbell*, 684 F.2d at 151 (quoting *Wilson*, 534 F.2d at 378–79). The fact that these conversations took place prior to deliberations does not transform them into extraneous influences or otherwise render them admissible absent indications that truly extraneous material was discussed. *See United States v. Cuthel*, 903 F.2d 1381, 1382–83 (11th Cir.1990); *United States v. Chiantese*, 582 F.2d 974, 978–79 (5th Cir.1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979); *see also Tan-*

**18.** *See* Michael York, *R Street Crew Leaders Were Big Spenders, Prosecutors Say,* Washington Post, Apr. 23, 1992, at C3.

*ner*, 483 U.S. at 120–22, 107 S.Ct. at 2747–49 (applying the external/internal distinction of Rule 606(b) to misconduct prior to deliberations).[19] For that reason, most of the juror-affiants' statements about pre-deliberation conversations about the trial are inadmissible and further investigation at a hearing is uncalled for.

### 5. *Removal of Alternate Juror Fleming*

■ A final instance of juror exposure to extra-judicial information, according to defendants, pertains to the excusal of alternate juror Pearl Fleming on April 29, 1992. Both Ms. Fleming and defendants now assert that her excusal from the jury was the result of a pre-deliberation "campaign" or "plan" by juror Janet Jellison to remove nonconforming jurors. *See* Defs.' Mem. at 4, 17; Fleming Aff. ¶ 3. At the outset, it must be reiterated that her testimony as to harassment or intimidation is not admissible to impeach the verdict. *See Campbell,* 684 F.2d at 151. In any case, the assertions about the circumstances of her excusal are meritless.

The trial record clearly shows that Ms. Fleming was excused because, after receiving complaints from other jurors about her continuing abusive and discourteous conduct toward them, counsel and the Court believed a mistrial would result if she remained. *See* Tr. Apr. 29, 1992 (Sealed Portion). The Court advised all counsel of problems involving Ms. Fleming after receiving a letter to the Court, drafted by Ms. Jellison on behalf of other jurors, which recounted in detail specific recent incidents of abusive behavior on the part of Ms. Fleming in addition to her repeated use of foul language directed at members of the jury. The letter further indicated that relations between this alternate and other members of the panel were "reaching a breaking point." *Id.* at 2. The letter was shown to all counsel. All counsel who spoke at the bench conference agreed that the document evinced belligerence on the part of Ms. Fleming toward her fellow jurors. Several counsel voiced concerns about a mistrial and the possibility that future confrontations involving this alternate

could become physical. *See id.* at 5–6. No doubts were expressed at the time about the seriousness or sincerity of the allegations contained in the letter and there were no objections to the Court's interviewing, and excusing, Ms. Fleming. *See id.* at 7–10.

Ms. Fleming herself confirmed that she had been involved in confrontations and arguments with other jurors. *See id.* at 11. She attributed this friction, however, to other female jurors being "jealous" of her and another juror, and to those other jurors "[t]alking about us and things like that, calling names and stuff." *Id.* at 11, 12. Although Ms. Fleming stated she could get along with the rest of the jury, the Court concluded that she must be excused to avoid the real possibility of a mistrial. *See id.* at 12–14.

Although Ms. Fleming's words and demeanor confirmed some of the allegations contained in the letter, there was not the slightest hint that disagreements over the guilt or innocence of defendants were in any way connected to complaints about her behavior. None of the other juror affiants so much as suggests that the excusal of Ms. Fleming was contrived at by Ms. Jellison or concerned substantive matters at trial. It must be remembered, moreover, that Ms. Fleming was an alternate juror and would not have deliberated. There is no likelihood, therefore, that her removal could have been prejudicial to defendants.

Thus, the Court finds there to be no credible evidence that Ms. Fleming was excused because she was a nonconforming juror as regards the guilt or innocence of defendants or that her removal was the fruit of a stratagem on Ms. Jellison's part. Having been informed at the time about juror complaints concerning Ms. Fleming, having investigated the matter during the trial, and having observed her demeanor during *voir dire* at the bench, the Court is firmly of the view that her assertions now to the contrary are quite simply incredible. *See* Fleming Aff. ¶¶ 2, 3. Rather, the sole reason for excusing Ms. Fleming, as the record shows, was to avoid a mistrial occasioned by abusive behavior

---

19. The Court will discuss the allegations concerning the foreperson's discussion of her husband's opinion of defendants' guilt below.

which her fellow jurors were no longer able to tolerate. This incident, in other words, in no way involved an inquiry into divisions among the jurors over the merits of the government's case or otherwise implicated well-settled principles concerning jury coercion. *See United States v. Norton,* 867 F.2d 1354, 1365–66 (11th Cir.) (citing cases), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989).

## C. Alleged Prejudicial Ex Parte Contacts Involving Jurors

A second category of juror misconduct claimed by defendants involves allegedly prejudicial extraneous influences on the jury, such as those involving *ex parte* contacts with third persons. Such influences do not involve "any fact in controversy or any law applicable to the case," *Rushen v. Spain,* 464 U.S. 114, 121, 104 S.Ct. 453, 457, 78 L.Ed.2d 267 (1983) *(per curiam ),* and thus do not involve the risk that a juror may become an "unsworn witness" whom the defendant cannot confront. *See McMann,* 435 F.2d at 817–18. For this reason, courts are not to grant a new trial unless it is determined that the *ex parte* contact resulted in actual prejudice to the defendant. *See Madrid,* 842 F.2d at 1093–94 (discussing *Rushen, supra,* and *Smith v. Phillips,* 455 U.S. at 215, 102 S.Ct. at 945).

### 1. Improper Communications between Jurors and Marshals

■ Defendants claim that improper communications occurred between the Marshals and jurors in several respects. First, they claim that the Marshals Office failed to inform the Court that some jurors had read the May 18, 1992 Washington Post article in which Anthony Nugent was identified as a gang enforcer. *See* Defs.' Mem. at 20. Second, defendants claim that the Marshals refused to pass notes from individual jurors to the Court complaining of the foreperson's conduct. *See id.* at 20–21. Third, defendants complain that the Marshals failed promptly to notify the Court that juror Isaac

had spoken to a person purporting to be a cousin of the defendants. *See id.* at 21–22.

Put simply, none of these examples involves an improper, *ex parte* contact between the jurors and the Marshals. None involved, for example, a Marshal's expression of his opinion to the jurors about the character of any of the defendants, *see McMann,* 435 F.2d at 816 (citing cases), or a Marshal telling the jury "that it will be locked up till it renders its verdict, however long that may take." *Haugh v. Jones & Laughlin Steel Corp.,* 949 F.2d 914, 917 (7th Cir.1991). Moreover, no prejudice could have resulted from any of these incidents. In the first instance, as discussed at length above, the Court ascertained on individual *voir dire* that exposure to the May 18 article was minimal at best and that each juror would disregard media reports of the trial. Second, even though the Marshals kept the Court well-informed as to discontents and personality conflicts among individual jurors, complaints about the foreperson's supposedly abusive conduct toward other jurors pertain to internal jury matters and, as such, are inadmissible in considering whether defendants must receive a new trial. *See Campbell,* 684 F.2d at 151. Third, the Marshals did alert the Court to Ms. Isaac's contacts with the third party and the Court interviewed her about them. Tr. July 6, 1992 (Sealed Portion), at 2, 8–11. There appeared to be no basis for the claim that this third person, with whom Ms. Isaac at one time had a relationship, was a cousin of any of the defendants or otherwise known to them. *See* Tr. July 6, 1992 (Sealed Portion), at 9, 13–14. The opinions of this third person which Ms. Isaac states in her affidavit she recounted to juror Scott—that defendant Darryl Williams' I.Q. really was 67 as his attorney alleged and that the government's allegations about the R Street defendants weren't true—would if anything aid defendants rather than prejudice them. *See* Isaac Aff. ¶ 14; Scott Aff. ¶ 11.[20] Any effect of these remarks on juror Isaac herself is irrelevant because she was excused later that

---

**20.** It should be noted, however, that Ms. Isaac disclosed neither of these alleged statements to the Court at the time she was individually questioned on *voir dire. See* Tr. July 6, 1992 (Sealed Portion), at 8–11, 14–15, 18–19.

day and did not deliberate. *See* Tr. July 6, 1992 (Sealed Portion), at 18.[21]

### 2. *Alleged Surveillance of a Juror's Home*

■ Defendants assert that an "extraneous influence" occurred as a result of the alleged surveillance of juror Isaac's home. *See* Defs.' Mem. at 15. Juror Isaac's affidavit recounts one incident during this lengthy trial when some unidentified person in an unidentified car parked in front of her house for unknown reasons. *See* Isaac Aff. ¶ 6. Defendants have come forward with no competent evidence to link this incident to the trial and Ms. Isaac merely states that she was scared. Any inference, therefore, that Ms. Isaac was somehow being threatened in connection with her service as a juror in the case is purely speculative. Even if a connection to the trial could be established, however, no prejudice could occur because this juror was excused prior to deliberations and defendants have not shown how the incident could have influenced any sitting juror.

### 3. *Contacts with Alternate Jurors During Deliberations*

■ Juror Isaac also claims that she spoke with juror Carl Biggs by telephone during deliberations and discussed juror Biggs concerns about the influence of the jury foreperson. *See* Defs.' Mem. at 23. During this conversation, Ms. Isaac claims that Mr. Biggs disclosed the foreperson's position on the RICO counts. *See* Isaac Aff. ¶ 13. She further states that "I told Carl not to take their houses and cars during the forfeiture because Nugent has children and they needed something to live in. Carl said he was going to do the best he could." *Id.*

Such *ex parte* contacts are clearly error. Defendants argue, however, that the error in this instance was tantamount to allowing an alternate juror into the jury room during deliberations and thus is plain error under the *per se* rule followed in the Second, Fourth, Ninth and Tenth Circuits, which require an automatic declaration of a mistrial. *See* Defs.' Mem. at 23–24 (citing *United States v. Beasley*, 464 F.2d 468 (10th Cir. 1972); *United States v. Nash*, 414 F.2d 234 (2d Cir.), *cert. denied*, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (1969); *Leser v. United States*, 358 F.2d 313 (9th Cir.), *cert. denied*, 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966); *United States v. Chatman*, 584 F.2d 1358 (4th Cir.1978); *United States v. Virginia Erection Corp.*, 335 F.2d 868 (4th Cir. 1964)). But this rule is no longer the law. In *United States v. Olano*, the Supreme Court rejected arguments that the mere presence of an alternate juror during deliberations, while a clear violation of Fed. R.Crim.P. 24(c), either affected substantial rights *per se* or was inherently prejudicial. *See United States v. Olano*, — U.S. —, — – —, 113 S.Ct. 1770, 1779–83, 123 L.Ed.2d 508 (1993). The Supreme Court held instead that "[t]he presence of alternate jurors during jury deliberations is not the kind of error that 'affects substantial rights' independent of its prejudicial impact." *Id.* at —, 113 S.Ct. at 1779. Hence, it was error for the court in review (in this case, a panel of the Ninth Circuit) to reverse convictions when defendants had "made no specific showing that the alternate jurors in this case either participated in the jury's deliberations or 'chilled' deliberation by the regular jurors." *Id.* at — – —, 113 S.Ct. at 1781.[22]

In any event, the analogy urged by defendants is severely strained. The Court believes that, even if the rule followed in the *Virginia Erection Corporation* line of cases were still good law, it would be inapposite here. As in *Olano, supra*, those cases involved situations in which an alternate juror was permitted to retire with the other jurors and be present during deliberations, in violation of Rule 24(c). *See Johnson v. Duckworth*, 650 F.2d 122, 124 (7th Cir.1981), *cert.*

---

21. Juror Isaac was excused at her own request. *See* Tr. July 6, 1992, (Sealed Portion), at 14–15, 18.

22. Because the Ninth Circuit panel in *Olano* squarely rested its holding of inherent prejudice on *Virginia Erection Corporation*, the Supreme Court's holding to the contrary effectively nulli- fied the *per se* rule followed in the entire *Virginia Erection* line of cases. *See United States v. Olano*, 934 F.2d 1425, 1438–39 (9th Cir.1991) (citing to and following the reasoning of *United States v. Virginia Erection Corp.*, 335 F.2d 868, 872 (4th Cir.1964)), *rev'd* — U.S. —, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

*denied,* 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981). The contact alleged here involved a single telephone call between a sitting juror and Ms. Isaac after she had been excused and was no longer participating in the proceedings. Ms. Isaac was at no time present in the jury room during deliberations and her contact was limited to a single juror rather than to the jury as a whole. Although juror Biggs may have divulged to her what he understood some of the foreperson's views to be, there was no intrusion by a stranger in violation of the privacy and secrecy of *the jury's* deliberations that would trigger the analysis of a Rule 24(c) error set forth in *Olano. See Olano,* — U.S. at —, — —, 113 S.Ct. at 1779, 1781; *accord Johnson,* 650 F.2d at 124–25 (stating that the privacy and secrecy of the jury is protected so as to foster free debate among the jurors). The Court, therefore, rejects defendants' argument that any plain error rule could apply to these facts.

In short, the analysis of this *ex parte* contact is the same as it would be had Mr. Biggs discussed the case during deliberations with a friend, or a family member, or a spectator, or the judge. That is, the Court should not grant a new trial unless the contact resulted in actual prejudice to the defendants. *See Maree,* 934 F.2d at 201. And here there was none. Ms. Isaac's affidavit indicates that her only discussion of the merits involved the RICO counts and her suggestion that the jury not vote that Anthony Nugent's house and car be "taken." Isaac Aff. ¶ 13. The jury acquitted on the RICO counts. The Court, prior to deliberations, dismissed the government's forfeiture case involving the only house in which Mr. Nugent was alleged to have an interest and the jury, contrary to Ms. Isaac's suggestion to juror Biggs, unanimously voted that the Mercedes–Benz automobile belonging to Mr. Nugent was subject to forfeiture. *See* Tr. July 23, 1992, at 82.

### 4. *The Foreperson's Discussion of the Trial with Her Husband*

■ The other credible allegation of an *ex parte* contact concerns the jury fore-

person. Four of the juror affiants state that, prior to deliberations, he or she heard juror Jellison state that her husband had told her to "nail" the defendants and send them to jail, or words to that effect. *See* Dews Aff. ¶ 7; Isaac Aff. ¶ 5; Scott Aff. ¶ 3; Garnett Aff. ¶ 10.[23] From these allegations, defendants argue that Ms. Jellison's husband influenced the jury's verdict. *See* Defs.' Mem. at 23.

Because extensive, active discussions between a juror and a third party about a defendant's guilt have been found, in certain circumstances, to amount to actual prejudice, *see Maree,* 934 F.2d at 202, the Court believed that further investigation of these allegations was required. Accordingly, Ms. Jellison was ordered to appear at the March 29 hearing, at which she responded under oath to questions put to her by the Court. Although Ms. Jellison admitted to having discussed certain aspects of the trial with her husband on one occasion, she denied that he ever told her that the jury should convict or "nail" defendants. *See* Hearing Tr. Mar. 29, 1993, at 13–14. The relevant portion of the Court's colloquy with Ms. Jellison went as follows:

Q. You say you discussed the trial. Was it the trial or the news articles that you discussed with your husband?

A. It was the evidence that I discussed with my husband and the personalities of the jurors.

Q. And the personalities of the jurors and the evidence?

A. And the evidence.

Q. How many times did you do this?

A. Just once, Your Honor.

Q. Once?

A. Yes, sir.

. . . .

Q. You discussed the trial on one occasion with your husband?

A. That's correct.

Q. The evidence and the jurors.

A. Personalities.

---

**23.** The fifth affiant, alternate Pearl Fleming, merely states that "Janet used to talk a lot about what her husband thought of the case," but recalls no specific statement or opinion attributable to him. Fleming Aff. ¶ 4.

Q. Was it during your travel to or from the courthouse or at home that this occurred?

A. At home.

Q. Did your husband during the trial ever make comments to you about the trial that you recall?

A. No, he did not.

Q. Simply did your husband ever suggest to you that the defendants should be convicted or the jury should nail the defendants?

A. No, he did not.

Q. Do you recall any comments he made to you?

A. My husband does not even talk that way, and he knows that I have good judgment. The only thing I spoke to my husband about was the evidence, mostly the guns and the cocaine because I've never been that close to it, and the personalities of the jurors. And he just told me just try to be as diplomatic as possible.

Q. You've made your statement, and I appreciate your being here today, Ms. Gellison [*sic*]. I am going to ask you some questions, because of these assertions that have been made, in slightly varying ways and ask you to listen to them to see if anything recollects your memory about any matter about your husband or any comment he may have made to you.

Do you recall your husband or any other person not associated with the trial making any comment in your presence about the guilt or innocence of the defendants?

A. No, Your Honor.

Q. Did your husband come to the court while you w[e]re sitting as a juror in this case?

A. He came twice.

Q. On two occasions?

A. On two occasions.

Q. Again asking the same question I asked before in a slightly different way, do you recall ever sharing your husband's or anyone else's views about the trial, any aspect of the trial, with the other jurors?

A. No, I do not.

. . . .

Q. Now that you discussed the matter with your husband or even if you heard any third person's views about the trial, do you believe you were able to follow the court's instructions and base your verdict solely on the evidence presented and the court's instructions?

A. That's exactly what I did.

Q. Do you believe any of these contacts, your knowledge of a witness or any of your contacts with your husband had any effect on your ability to reach a fair and impartial verdict?

A. I'm sorry.

Q. Do you believe that any of your contacts or recognition of witnesses in any way affected your ability to reach a fair and impartial verdict?

A. No, Your Honor.

*Id.* at 13–16.

During the entire exchange with juror Jellison, the Court carefully observed her demeanor as she responded to the questions put to her. Contrary to the subsequent assertions by counsel for defendant Restrepo, Ms. Jellison did not look down or avoid eye contact with the Court as she spoke. *See* Hearing Tr. Mar. 29, 1993, at 28.[24] Her responses were unequivocal and clear. On the other hand, it is entirely likely that the affiants' recollections of what she may have said "during the government's case," Dews Aff. ¶ 7, were colored by their subsequent discussions with Ms. Jellison during deliberations, which one juror describes as having been "heated," Scott Aff. ¶ 13, or by personal dislike of her. *See* Fleming Aff. ¶ 3. It is evident to the Court that Ms. Jellison has a strong personality and, if the affidavits are to be believed, leaned heavily toward conviction during deliberations and sought to influence other jurors accordingly. *See* Scott Aff. ¶¶ 10, 13; Garnett Aff. ¶ 16. Whatever these jurors recall having heard Ms. Jellison *say* about her husband before deliberations, however, the Court finds credible her statement

---

**24.** *None* of counsel's characterizations of Ms. Jellison's demeanor comports with what the Court observed. *See* Hearing Tr. Mar. 29, 1993, at 28, 33.

that her husband did not say anything to her about defendants' guilt.

Even if Ms. Jellison's husband had advised her to "nail" defendants, however, a single comment of this sort does not amount to actual prejudice. Indeed, precisely because "it is virtually impossible to shield jurors from every contact or influence that might affect their vote," *Phillips*, 455 U.S. at 217, 102 S.Ct. at 946, courts have refused to overturn a jury verdict absent the requisite showing of prejudice. Even threats to jurors from third parties have withstood motions for mistrial or a new trial when the juror in question affirmed that she could put aside the incident and be fair to both sides. *See Sanders*, 962 F.2d at 666–67, 669–74. When actual prejudice has been found from *ex parte* contacts, the contacts involved extensive discussions between the juror and third parties, in which the latter "confronted" the juror with "strong opinions concerning the outcome" of the case in an "aggressive manner." *Maree*, 934 F.2d at 202. Even accepting defendants' version of what was said, therefore, Ms. Jellison's contact with her husband about the trial and her subsequent comments to other jurors fall well short of the factual predicates that could support a finding of actual prejudice.

## D. Allegations of Juror Bias

■ The third category of juror misconduct concerns claims that two jurors failed to answer *voir dire* questions truthfully. As our court of appeals has summarized it, "lying or failing to disclose relevant information during *voir dire* itself raises substantial questions about the juror's possible bias." *Boney*, 977 F.2d at 634. At the same time, this circuit has declined to adopt a rule, such as that followed in the Second Circuit, that regards any deliberate concealment of pretrial information as *per se* evidence of juror bias that compels a mistrial. *See United States v. North*, 910 F.2d 843, 904–05 (D.C.Cir.1990) (discussing and rejecting the rule of *United States v. Colombo*, 869 F.2d 149 (2d Cir.1989)), *cert. denied*, —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Rather, following *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104

S.Ct. 845, 78 L.Ed.2d 663 (1984), our court of appeals has concluded that a new trial is mandated only upon a showing that the juror was actually biased against the defendant. *See Boney*, 977 F.2d at 633–35; *North*, 910 F.2d at 904–05. In making this determination, the court of appeals has indicated that the trial judge is required to hold an evidentiary hearing if the information allegedly concealed is of such a serious or sensitive nature that disclosure would have led to the juror's disqualification. *See Boney*, 977 F.2d at 634 & n. 9. However, the court of appeals has also expressly declined to hold "that any false statement or deliberate concealment by a juror necessitates an evidentiary hearing." *Id.*

With the recent guidance of the court of appeals in mind, the Court will now consider defendants' specific claims of juror dishonesty.

### 1. *Juror Biggs' Familiarity with the R Street and Lincoln Road Area*

■ In her affidavit, juror Shalita Isaac states that, at the time of her drive through the R Street and Lincoln Road neighborhood with juror Carl Biggs, Biggs mentioned that he used to live at 11 R Street and recalled the faces of defendants Kevin Williams–Davis and Anthony Nugent "from growing up on R Street." Isaac Aff. ¶ 12. Defendants correctly point out that juror Biggs did not disclose his prior connection to the R Street area during the initial *voir dire* of prospective jurors.

During the *voir dire* conducted on February 18, 1992, the Court asked prospective jurors about any prior knowledge they may have of the defendants. *See* Tr. Feb. 18, 1992, at 39, 45. The Court also asked the following question:

Does any one live in areas where certain events are alleged to have taken place and which you will hear about it during the course of this trial, including Lincoln Road and R Streets, Northeast, Lincoln Road and R Streets, Northeast in the District of Columbia [*sic*] . . .

Do any of you have particular familiarity with these locations or know someone who lives in the vicinity out of those places that

I've just named? There were several, may I see the show of hands?

*Id.* at 56–57. The transcript indicates that Mr. Biggs did not raise his hand in response to these questions.

Defendants suggest that Mr. Biggs's failure to respond may indicate potential bias on his part toward them. The Court agreed that the allegation was serious enough to warrant further investigation and accordingly questioned Mr. Biggs about his prior contacts with the R Street area at the March 29 hearing. The Court conducted the following colloquy with Mr. Biggs, asking him many of the questions previously submitted by defense counsel.

Q. Thank you, Mr. Biggs for appearing. You may recall—it has been over a year ago—that I convened a panel of jurors to select the jury from and you were among the members of that panel that sat in the rear of the courtroom on left as you face the rear of the courtroom. Do you recall that, sir?

A. Yes.

Q. Do you recall if during that preliminary examination of the panel I asked if any one lives in areas where certain events were alleged to have taken place which included the Lincoln Road and R Street address. Do you recall that question?

A. Yes, I do.

Q. Also whether anyone had any particular familiarity with those locations or knows someone who lives in the vicinity of those places. Do you recall my asking those questions?

A. Yes, I do.

Q. After I asked those questions, several of the prospective jurors stepped forward to the bench and we had a further voir dire of the jurors. You, however, did not raise your hand or indicate any response to the question. Do you recall that?

A. Yes.

Q. Would you tell the court at this time how long you have lived in the Washington, D.C. area?

A. I've been in Washington about 13 years.

Q. Now, sir, it has come to my attention that you may have some familiarity with the R Street area. I ask you is that true?

A. No, it is not.

Q. You don't know the R Street and Lincoln Road area at all. You know where it is?

A. I know where it is.

Q. Did you live on R Street at any time?

A. I lived at 1630 Lincoln Road, not R Street.

Q. On Lincoln Road?

A. Yes.

Q. 1630?

A. Yes.

Q. When did you first move to that address?

A. It was about the beginning of June.

Q. Of what year?

A. 1980.

Q. Had you ever been to that address before that date, before June of 1980?

A. No.

Q. How long did you live at that address, please, Mr. Biggs?

A. About four months.

Q. Where did you move when you left that address?

A. I went back to 1210 Florida Avenue to live.

Q. After you left that address and went to the Florida Avenue address, did you ever return to that part of Lincoln Road or R Street again?

A. No.

Q. Before this trial began, had you ever returned there after you moved from it? After you moved from it in 1980 after being there four months, did you ever go back to that area?

A. No, I didn't.

Q. Before the trial began last year?

A. No, I haven't been back in that area.

Q. Now, Mr. Biggs, when you lived on Lincoln Road or at any other time that you

can remember, did you see any of the defendants that are here in court on the street or in the neighborhood or in their homes?

A. No.

Q. When was the first time that you ever saw Kevin Williams–Davis or Anthony Nugent or any of the other defendants?

A. When I first came down here.

Q. When was the first time that you ever heard the names of the defendants?

A. When I first came to this courtroom.

Q. Mr. Biggs, what is your date of birth?

A. 11–17–51.

Q. 1951?

A. Yes.

Q. You are 42 years old?

A. Yes.

Q. When you were living on R Street, were you working or going to school?

A. I was working two jobs.

Q. Mr. Biggs, did you know or recognize any of the witnesses who appeared at this six-month long trial, this trial over a period of six months?

A. No.

Q. Mr. Biggs, when I asked during voir dire about familiarity with [the] R Street and Lincoln Road area, is there any reason that you recall that didn't raise your hand at that time?

A. Yes. It was because I had just come to this area to live in D.C. I didn't know anybody here in 1980. I was originally from New Jersey. I moved from New Jersey to D.C. I had never been here before a day in my life.

Q. With regard to the question of familiarity with the area, did you believe it applied to you?

A. Yes.

Q. And yet you did not raise your hand?

A. I didn't feel it was necessary.

Q. Even though you didn't respond to the question during voir dire, did you feel at the time that you were able to continue to follow the court's instructions to base your verdict on the evidence and the court's instructions?

A. Yes.

Q. Do you believe that your familiarity with the Lincoln Road and R street area as we have discussed it has had any negative or adverse impact on your ability to reach a fair and impartial verdict?

A. No.

Hearing Tr. Mar. 29, 1993, at 5–10. From his demeanor and his responses, the Court was impressed that Mr. Biggs appeared to be making a sincere effort to understand the questions put to him and to respond truthfully to them.

Having heard Mr. Biggs' testimony, given under oath, and considered the statements in Ms. Isaac's sworn affidavit, the Court agrees with defendants that Mr. Biggs did indeed fail to disclose his prior familiarity with the R Street and Lincoln Road area. The Court is satisfied, however, that his failure to do so does not reflect bias on his part toward defendants. The Court credits his testimony that he resided at 1630 Lincoln Road for a four-month period in 1980. His sojourn in that neighborhood was brief and ended well before any of the criminal activities at issue in this trial occurred. The Court further credits his testimony that he did not know or recognize any of the defendants prior to the beginning of this trial. It is entirely reasonable to think, therefore, that his failure to respond to the question about familiarity with the R Street area—his apparent belief that it was unnecessary to do so—reflected the circumstances of his stay there. Moreover, disclosure of this degree of familiarity with the R Street and Lincoln Road area would not in itself have been grounds to excuse Mr. Biggs for cause.[25] Defendants have come forward with no other competent evidence concerning juror Biggs that would

---

**25.** Indeed, Mr. Biggs's prior acquaintance with the R Street area appears no stronger than that of juror Wayne Scott, one of the affiants upon whom defendants rely, who disclosed during *voir* *dire* that he had worked with Kevin Williams–Davis's father at one time. *See* Tr. Feb. 18, 1992, at 43–44.

indicate bias. If anything, the affidavits suggest that he may have been sympathetic toward them. *See* Isaac Aff. ¶ 13; Scott Aff. ¶ 10. In short, no showing of actual bias has been made here.

### 2. *The Foreperson's Alleged Bias*

Defendants' allegations concerning the jury foreperson are less straightforward than those concerning Mr. Biggs. To reach the conclusion that Ms. Jellison was actually biased, they lump together allegations from the affiants that she lied to the Court about her exposure to media coverage during the trial, that she "engaged in a pre-deliberation campaign to convince other jurors of defendants' guilt and to have non-conforming jurors struck from the jury," and that "[s]he improperly distorted the communication process between the judge and jury," together with her failure to disclose her criminal record during *voir dire*. Defs.' Mem. at 4. Yet their memorandum cites not a single case that holds that otherwise inadmissible juror testimony about intra-jury communications can be rendered competent by bootstrapping it onto an instance of juror dishonesty during *voir dire*. *See id.* at 16–18.

■ As discussed earlier in this opinion, Rule 606(b) and the case law in this Circuit make clear that juror testimony about intra-jury influences, including testimony about "intimidation or harassment of one juror by another" or testimony of juror intransigence, are inadmissible to impeach a jury verdict. *Campbell*, 684 F.2d at 151; *see also Gereau*, 523 F.2d at 149–50. The arm-twisting, haggling and compromise that can go on within a particular jury may not be a pretty sight, but it has long been accepted as part of "the give-and-take within this microcosm of the community." *Campbell*, 684 F.2d at 151. Thus, allegations that Ms. Jellison discussed the case with other jurors prior to deliberations, that she tried to influence the outcome of the jury's verdict in various ways, that she may have said unkind things about the mother of one of the defendants, and that she may have vigorously disagreed with the affiants

and other jurors about the extent of defendants' guilt all fall squarely within the scope of Rule 606(b) and may not be considered by this Court. Allegations that Ms. Jellison read newspaper accounts of the trial and engaged in *ex parte* contacts to the prejudice of defendants have been addressed above. What remains to be considered is her failure to disclose her criminal record at the initial *voir dire*.

Even though defendants do not rest their claim of juror bias so squarely on this instance of dishonesty as they do in the case of juror Biggs, the Court will nevertheless address it in some detail because of the sensitive nature of the problem itself and because some defense counsel have repeatedly mischaracterized Ms. Jellison's history of prior convictions and their own position on her fitness as a juror.

At the *voir dire* on February 18, 1992, the Court asked the following question of all potential jurors:

Have any of you or any member of your immediate family ever been involved as a party, that is as a plaintiff or a defendant, or have appeared as a witness in any court proceeding, civil or criminal, or by an official legislative body or agency conducting an investigation? May I have a show of hands? Approach the bench individually.

Tr. Feb. 18, 1992, at 174. There is no dispute that Ms. Jellison, who would subsequently be selected as a juror, did not raise her hand or come forward or otherwise affirmatively respond to the question.

On June 4, 1992, the prosecutor brought to the attention of the Court, in the presence of defense counsel and at a bench conference on the record which the Court placed under seal, the fact that Ms. Jellison was currently on probation to the United States Probation Office in the District of Columbia. *See* Tr. June 4, 1992 (Sealed Portion), at 2.[26] At that time, the prosecutor disclosed that Ms. Jellison had a misdemeanor conviction for some form of theft. *See id.* at 3. The Court indicated the need for further investigation

---

**26.** The prosecutor represented that he had learned of this by a phone call to his office the day before from a probation officer and that, although he himself had spoken with the probation officer, his contact with the probation office was exceedingly brief. Tr. June 4, 1992 (Sealed Portion), at 2, 4. The Court has no reason to doubt these representations.

of the matter and, after lunch, excused the jury for the remainder of the day. The Court then inquired of counsel whether, at that point, there vere any objections; counsel had none. *See id.* at 7.[27]

Later that same afternoon, at another bench conference on the record and under seal, the Court indicated to all counsel that its investigations revealed that Ms. Jellison should have responded to its Ridley question and failed to do so. *See id.* at 9. The Court advised counsel that Ms. Jellison had several arrests and charges going back to 1975, including a 1990 conviction for which she was currently on probation and under order to pay over $37,000 to the federal government and perform 200 hours of community service. *See id.* at 10.

The Court met with counsel again about the matter on the morning of June 5, 1992, and apprised them that it had now learned, from its own interview with Ms. Jellison's probation officer, that a 1977 conviction was for a misdemeanor and not a felony. Tr. June 5, 1992 (Sealed Portion), at 2, 7. The upshot was that Ms. Jellison had no felony convictions in her criminal record that would be disqualifying. *See id.* Nevertheless, the Court explored with all counsel the concern that she might feel some subtle pressure because of her probationer status to favor conviction and heard again in detail from the prosecutor about his conversation with her probation officer. *See id.* at 3–6. The Court also considered with counsel the possibility that Ms. Jellison may not have responded to the Ridley question so she could use the payments she received for jury service in a lengthy trial to make her restitution payments. *See id.* at 6–8. The Court expressed its opinion then, as it had the day before, that Ms. Jellison should be excused. *See id.* at 3, 6–7; Tr. June 4, 1992 (Sealed Portion), at 9.

Rather than so rule at that point, however, the Court agreed to requests from counsel that they be allowed to caucus among themselves and then present their considered views to the Court. *See* Tr. June 5, 1992 (Sealed Portion), at 6, 8–9. There were, it must be stressed, considerations that weighed in favor of retaining Ms. Jellison on the jury: Defense counsel pointed out that she was attentive, she appeared conscientious to the Court, and, late in the trial, the number of remaining jurors was close to the minimum that could be sent back to begin deliberations. *See* Tr. June 4, 1992 (Sealed Portion), at 7, 9, 12; Tr. June 5, 1992 (Sealed Portion), at 8. At the same time, the Court considered and rejected a suggestion that Ms. Jellison be told at that late stage in the trial that she was now an alternate juror. *See* Tr. June 5, 1992 (Sealed Portion), at 10–12. Accordingly, the Court advised counsel that it would excuse her unless all counsel agreed unanimously that she should be kept. *See id.* at 12–13. At the end of the day, with counsel having had time to confer with their clients and with each other, the Court heard from each counsel individually in a final bench conference. Counsel for the prosecution and *all* counsel for defendants agreed, unanimously, that she should remain a juror and deliberate. *See id.* at 16–17.

Having been so advised by counsel, the Court then called Ms. Jellison into the courtroom and, counsel having stepped back, conducted the following colloquy:

> Q. I asked you to remain back because you've been here diligently every time. And it's come to the attention of the Court—and I wanted you know it's come to our attention that you are on a misdemeanor probation at the court. And that's not disturbed the parties, any of the parties, or the Court if it doesn't in any way [a]ffect your ability to [be] fair and impartial in this case. Are you satisfied that you could be a fair and impartial juror notwithstanding your involvement in the criminal justice system?
>
> A. Yes, sir, although that happened when I was in college, 12 years ago.

---

27. Counsel for Anthony Nugent stated that "we certainly do not have any problem with a juror who somehow did not respond to a misdemeanor, a one-time deal and who has paid intense attention to this case." Tr. June 4, 1992 (Sealed Portion), at 7. Counsel for Alba Restrepo stated that "we would oppose at this juncture any removal of the juror from the panel." *Id.*

Q. You're talking about in North Carolina in 1977. I'm talking about the recent matter.

A. Oh, yes, I got you.

Q. You have a very substantial matter that is broken down into a misdemeanor plea before the Magistrate. I'm aware of all the facts as well as the other arrests that have not resulted in convictions. There were several other arrests. You have a history of involvement but there are no felony convictions. You've been selected as a juror. The parties selected you as a juror after a very open discussion of the questions and all. And my question to you is simply this—you are aware that the Court is aware of this. Does that in any way affect your ability to be fair and impartial in judging the case in which you are now sitting?

A. No, sir.

Q. And you will give all parties—

A. Fair play, fairly, yes.

Q. Both sides?

A. Both sides.

Q. All right. I want to see you back Monday morning. All right.

A. Thank you.

*Id.* at 20–21. In view of Ms. Jellison's responses during this colloquy, and the unanimous advice of counsel that she should remain as a sitting juror, the Court did not excuse her.

To summarize: When the facts of Ms. Jellison's criminal history were discovered during trial, all counsel were notified promptly and the Court undertook an immediate investigation; the Court ascertained the facts of her criminal record and discussed at length with counsel the various factors that might lead her to be excused or retained as a juror; the Court clearly and repeatedly stated its willingness to excuse her, gave defense counsel time to confer with their clients and with each other about whether she should stay; and the Court ascertained from Ms. Jellison herself that, notwithstanding the revelations about her criminal record, she could continue to serve as a fair and impartial

juror. The Court gave defendants every opportunity to object to her continued service on the jury at the time these matters came to light, and none did so.

Two conclusions inescapably follow. First, defendants' statement in their Memorandum that "some defendants objected to [Ms. Jellison's] presence on the jury when her probationary status was disclosed," Defs.' Mem. at 18, is grossly misleading to say the least. Whatever reservations defendants may have expressed at first about Ms. Jellison's continued service on the jury when her criminal record came to light, *all* defendants agreed to keep her after the Court advised them of the true nature of her criminal record and gave them an opportunity to confer. *See* Tr. June 5, 1992 (Sealed Portion), at 16–17. The record is utterly unambiguous in this respect.

■■■ Second, by not raising the claim at trial when they had the opportunity to do so, defendants waived their claim of bias as regards Ms. Jellison's failure to respond truthfully to the Ridley question on *voir dire.* It is firmly established that "a defendant's failure to raise a claim of juror bias until after trial, when the issue of potential bias was known by the defendant during trial, amounts to a waiver of the claim." *United States v. Costa,* 890 F.2d 480, 482 (1st Cir. 1989); *accord United States v. Bolinger,* 837 F.2d 436, 438–39 (11th Cir.), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988).[28] Defendants have come forward with no new evidence concerning this incident that would warrant revisiting the claim and inquiring further. *See Bolinger,* 837 F.2d at 439 (explaining that motions for a new trial based on juror misconduct, because they are a form of new trial motion based on newly discovered evidence, must be supported by proof that the misconduct was not discovered until after the verdict was returned). Their repeated description of Ms. Jellison's current status as that of being on "felony probation" is either a mischievous mischaracterization of the record or wishful thinking. *See* Defs.' Mem. at 4, 18; Hearing Tr. Mar. 29, 1993, at 32. So that the record

---

28. Defendants were evidently acquainted with this principle at the time Ms. Jellison's record

was discussed. *See* Tr. June 5, 1992 (Sealed Portion), at 13.

is clear, however, the Court will attach as Appendix A to this Opinion and Order a memorandum, dated April 2, 1993, from the Chief United States Probation Officer of this court, summarizing Ms. Jellison's criminal record based on his independent investigation, and confirming that her prior convictions were for misdemeanors only. The Court will also file, under seal, a certified copy of the criminal docket entry from the State of North Carolina concerning Ms. Jellison's conviction there.

 In short, there has been no showing by credible, competent evidence of actual bias toward defendants on the part of the jury foreperson. Although there is evidence of her dishonesty, as discussed above, this evidence must be weighed against her attentiveness and conscientiousness at trial and her repeated assurances to the Court that she would be fair and impartial. In the absence of competent evidence to cast doubt upon the reliability of those assurances, they are not to be regarded as suspect. *See Butler,* 822 F.2d at 1196–97 (discussing *Phillips,* 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7). That she may have strongly favored conviction during deliberations is not, in itself, an indication of bias. Given the overwhelming amount of evidence against defendants, an attentive juror could well have come to the same conclusions about their guilt that the jury actually reached in this case.

### E. The Removal of Juror Scott

Defendants claim error in the removal of juror Wayne Scott on July 20, 1992, some two weeks into deliberations, for medical reasons. Specifically, they claim, on the basis of Mr. Scott's affidavit, that he was excused against his will and that, had he known the Court would excuse him, he would not have informed the Court of his medical problems. *See* Scott Aff. ¶ 2; Defs.' Mem. at 24–25. This claim is meritless.

The record indicates that, on the morning of July 20, 1992, Mr. Scott phoned the jury office to report that he was not feeling well and thought he should see his doctor. Tr. July 20, 1992, at 2. After learning that Mr. Scott was unwell, the Court halted deliberations for the morning so that he could see his physician. *See id.* at 2–3. Mr. Scott had suffered from headaches and high blood pressure at various times during the trial, for which he had sought medical treatment. *See, e.g.,* Tr. June 4, 1992, at 8. After examining Mr. Scott on July 20th, his doctor sent the Court a note stating that Mr. Scott had been suffering from severe headaches for several months, that prescribed medications had not helped the problem, that he was scheduled to undergo further diagnostic procedures later that same week, and that, in the doctor's professional opinion, Mr. Scott should not continue with his jury service until the doctor had seen the results of those procedures. *See* Tr. July 20, 1992, at 3. The Court read the doctor's note to all counsel and then directed that it be made a part of the record.

Because of the severity of Mr. Scott's medical condition and the need to avoid further hiatus in deliberations after a lengthy trial, the Court believed that just cause existed to invoke Fed.R.Crim.P. 23(b) and advised all counsel to that effect. *See id.* Nevertheless, the Court inquired of counsel as to a reasonable alternative; none was offered. *See id.* at 3–5. All counsel agreed that Mr. Scott should be excused and deliberations should continue with the 11 remaining jurors. *See id.* at 5–6. Mr. Scott was called in to the courtroom and advised at the bench that he would be excused from the jury for the reasons set forth in the note from his physician. *See id.* at 8. While the Court did not solicit Mr. Scott's opinion in the matter, it did not prevent him from speaking either. Mr. Scott did not at that time express any opposition or unwillingness to being excused from the jury. *See id.*

The Court remains satisfied that it had just cause to excuse juror Scott. Its invocation of Rule 23(b) in these circumstances is well supported under the Advisory Committee's Notes to the 1983 Amendment of the Rule, *see* Fed.R.Crim.P. 23(b) advisory committee's note, and the relevant case law. *See United States v. Dischner,* 974 F.2d 1502, 1512–13 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993); *United States v. Wilson,* 894 F.2d 1245, 1250–51 (11th Cir.), *cert. denied,* 497 U.S.

1029, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990); *cf. United States v. Essex,* 734 F.2d 832, 839 (D.C.Cir.1984) (citing the Advisory Committee Notes that invocation of the Rule requires a finding that excusal is necessary for just cause, which includes illness of the juror). Moreover, "[e]xcusing a juror is generally appropriate when the trial is lengthy and waiting for the juror will result in a substantial or potentially uncertain delay." *Dischner,* 974 F.2d at 1513; *accord Wilson,* 984 F.2d at 1250.

Mr. Scott's supposed leanings as regards conviction [29] and his asserted influence over his fellow jurors, *see* Scott Aff. ¶ 10, were unknown to the Court and to the parties at the time Mr. Scott was excused. There was, moreover, no indication that the jury was deadlocked. The case cited by defendants, *United States v. Tabacca,* 924 F.2d 906 (9th Cir.1991), does not support the sweeping proposition claimed for it: that "[i]t was error to dismiss a juror this late in deliberations against his will where the effect was to materially change the verdict." Defs.' Mem. at 25. In *Tabacca,* the Ninth Circuit found that, in the context of a two and a half day trial in which only three government witnesses testified and the court having received a note that the jury was deadlocked after a mere day and a half of deliberations, there was no just cause excuse a juror who informed the trial judge that his wife had taken his car keys that morning and that he was therefore unable to get to the courthouse that day. *See* 924 F.2d at 913, 915. The *Tabacca* court explicitly distinguished the facts before it from the application of Rule 23(b) in cases similar to this one, involving lengthy trials in which the length of the juror's absence was uncertain. *See id.* at 915.

## F. Alleged Prosecutorial Misconduct

■ Finally, defendants allege misconduct on the part of the lead prosecutor, whom they assert coached the testimony of witnesses. *See* Defs.' Mem. at 25. Defense counsel raised this issue with the Court at trial when they called attention to the prosecutor's tendency to shake or twitch his head from time to time. *See* Tr. Feb. 21, 1992, at 159; Tr. Feb. 27, 1992, at 48, 99. The prosecutor repeatedly and vehemently denied that he was coaching witnesses. *See* Tr. Feb. 21, 1992, at 159; Tr. Feb. 27, 1992, at 99. Once alerted to this issue, the Court monitored the behavior of the prosecutor throughout the remainder of the trial and is satisfied that the reported conduct was merely a mannerism and was not an attempt to coach the testimony of any witness. The juror-affiants were in no better position than the Court to observe the behavior of the prosecutor during the testimony of witnesses and their opinions that the witnesses were being coached are merely speculative and conclusory. *See* Dews Aff. ¶ 5; Fleming Aff. ¶ 7; Isaac Aff. ¶ 11; Scott Aff. ¶ 6; Garnett Aff. ¶ 11. The Court finds no evidence of prosecutorial misconduct here.

## G. Conclusion

In the final analysis, defendants' joint motion appears to rely on the cumulative impact of supposedly rampant instances of misconduct that infected the jury and tainted the verdict in this case. *See* Defs.' Reply at 4, 7. Instances of misconduct there certainly were, although when these are filtered through Fed.R.Evid. 606(b) they turn out to be significantly fewer in number than defendants allege. And when each instance of misconduct is carefully analyzed and the appropriate legal standard applied, evidence of prejudicial error comes up well short.

■ The oft-stated maxim may be repeated here, that " '[a defendant] is entitled to a fair trial but not a perfect one.' " *Boney,* 977 F.2d at 633 (quoting *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953)). The Court has used the appropriate tools available to it

---

**29.** Nowhere in his affidavit does Mr. Scott state—or even imply—that he favored the defendants' acquittal. *See* Scott Aff. ¶¶ 2, 7, 10, 13. Defendants' assertion that "Juror Scott was a leader of a group of four to six jurors who opposed guilt" rests, therefore, solely on an opin- ion attributed to him by Juror Garnett, which Mr. Scott was apparently unwilling to state for himself. *See* Garnett Aff. ¶ 16. As will be explained below, the Court finds Juror Garnett's affidavit particularly unreliable.

to determine whether colorable allegations of error involving the jurors prejudiced defendants' right to a fair trial. In making its determinations on this question, the Court bore in mind the presumption of validity accorded jury verdicts, the concern that the Court's inquiries "not create prejudicial effects by unduly magnifying the importance of an insignificant occurrence," *Butler*, 822 F.2d at 1196, and that its primary responsibility was to "erect[ ], and employ[ ], a suitable framework for investigating the allegation and gauging its effects, and thereafter spell[ ] out [the Court's] findings with adequate specificity to permit informed appellate review." *Boylan*, 898 F.2d at 258. When the effects of each colorable instance of juror misconduct were gauged, the requisite showing of prejudice or bias did not appear. While the Court may agree that defendants did not receive a perfect trial, it is confident that they received a fair one.

One final comment is in order. This case demonstrates the salutary role that Rule 606(b) plays in our system of justice, for in an important respect the instant post-verdict motion is really not about juror misconduct as such. It must be remembered that this lengthy trial involved a prosecution strategy that was new to the District of Columbia. The configuration of the charges—including the use together of RICO *and* CCE *and* drug conspiracy *and* numerous substantive counts—and the resulting complexity of the case, while in the Court's view neither legally impermissible nor constitutionally infirm, gave the prosecution a hard-ball edge. The evidence against each defendant, moreover, was overwhelming. The exposure to lengthy periods of imprisonment if convicted, including life terms without parole in several instances, was great. In short, the stakes for defendants were high.

These aspects of the trial clearly made an impression on some of the jurors. In a post-verdict interview with Washington Post reporters, several stated that the jury acquitted on the RICO counts because they believed (mistakenly) that these carried the heaviest penalties. *See* Michael York & Linda Wheeler, *Fear Said To Affect R St. Jury,*

Washington Post, July 24, 1992, at B1.[30] Juror Frank Garnett was quoted in the article as expressing surprise when he learned that three of the defendants could still receive life sentences without parole. *See id.* Mr. Garnett also criticized the prosecution strategy "because the government appeared more concerned with prosecuting the R Street defendants than their cocaine suppliers in Central America." *Id.* These publicly-expressed sentiments strongly suggest a motive on Mr. Garnett's part to impeach his own verdict. His affidavit, the Court firmly believes, should be viewed in this light. The apparent motivation diminishes the credibility of his affidavit.

Thus, it may well be that the affidavits on which defendants so heavily rely in the instant motion spring from a feeling of unease on the part of these jurors over the sentencing consequences that defendants may face in light of the mandatory minimums and the Sentencing Guidelines. To be candid, the Court harbors some of those same feelings. But the Court, no less than the jurors, is bound to apply the law as it exists and must evaluate the claims of juror misconduct raised here in light of the relevant rules and legal standards. The Court believes it has done so.

Defendants' joint Motion to Dismiss, Or in the Alternative, For New Trial, must be denied.

## III. DEFENDANT JOYCE W. BOYD'S POST-VERDICT MOTION

In addition to joining the motion discussed above, defendant Joyce W. Boyd moves separately for a new trial and/or judgment of acquittal notwithstanding the verdict. The grounds asserted are that she was convicted against the weight of the evidence and that her joinder with the other defendants in the first R Street trial was prejudicial.

Ms. Boyd was convicted of one count of conspiracy to distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846, one count of money laundering in violation of 18 U.S.C. § 1956(a), and one count of engaging in a

---

**30.** The Court has attached a copy of this article as Appendix B to this Opinion and Order.

monetary transaction using criminally derived property in violation of 18 U.S.C. § 1957. The gravamen of the government's case against her was that she was the banker for the R Street Organization, receiving the organization's funds and depositing them in various bank accounts, that she leased in her own name a Mercedes–Benz automobile for the use of her nephew Kevin Williams–Davis with funds derived from the drug trafficking activities of the R Street Organization, and that she recruited a friend, Dale Webster, to store cocaine, liquid phencyclidine (PCP) and marijuana, for the organization.

■ Defendant correctly states that, in ruling on a motion for a new trial on the ground that the verdict is against the weight of the evidence, the district court may weigh the evidence itself and make its own evaluation of the credibility of witnesses. *See Tibbs v. Florida,* 457 U.S. 31, 38 n. 11, 102 S.Ct. 2211, 2216 n. 11, 72 L.Ed.2d 652 (1982). Unlike a motion for a new trial based on the insufficiency of the evidence, the trial court need not view the evidence produced at trial in the light most favorable to the verdict. *See id.; Ortiz,* 942 F.2d at 907.

■ Unfortunately, the application of these principles does not help defendant. The Court observed the witnesses who testified against Ms. Boyd and has reviewed their testimony in transcript. The Court found the testimony of one of the government's chief witnesses against her, Dale Webster, to have been quite credible. Ms. Webster's detailed testimony connected Ms. Boyd to the drug trafficking activities of Kevin Williams–Davis and his associates, recounting how she recruited Ms. Webster to store drugs for the gang and later how she would receive large sums of money from Williams–Davis and Anthony Nugent and deposit these funds so as to avoid alerting authorities. This testimony, in the Court's view, clearly showed that Ms. Boyd was a part of this drug conspiracy and supported the verdict against her on the conspiracy count. The Court is also satisfied that there was substantial, credible evidence to show that Ms. Boyd engaged in the money laundering activities involving the lease of the Mercedes for which she was convicted.

■ Ms. Boyd's other argument asks this Court to revisit yet again its decision not to sever her from the other defendants in the first trial on grounds of prejudicial joinder. Although Ms. Boyd was not a ringleader of the R Street Organization,[31] she was certainly a member of the same drug conspiracy in which her co-defendants were also involved. Her crimes were integrally related to the operations of the conspiracy as a whole and to the activities of defendants Nugent and Williams–Davis in particular: She played a substantial role in laundering *their* money. At the same time, her role in the organization was sufficiently discrete so as to minimize the spillover effects from evidence against her co-defendants arising from *their* involvement in crimes of violence and the operation of street sales of narcotics. Because there was *no* evidence connecting Ms. Boyd either to violent acts or to street sales, the Court does not believe that the jury could have attributed to her any of the evidence it heard concerning her co-defendants in these respects. *See United States v. Manner,* 887 F.2d 317, 324 (D.C.Cir.1989) (discussing *Butler,* 822 F.2d at 1194, as to the specific dangers of prejudicial spillover), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990).

Thus, although the volume of evidence against her co-defendants greatly exceeded the volume of evidence against her, the Court is satisfied that any possible prejudice arising therefrom was not beyond the power of a curative instruction, which our court of appeals has reiterated is "usually sufficient to minimize any disparities in evidence." *Id.* (citing *United States v. Tarantino,* 846 F.2d 1384, 1398 (D.C.Cir.), *cert. denied,* 488 U.S.

---

31. The Court dismissed the RICO counts against Ms. Boyd at the conclusion of the government's case because the prosecution had not proved that she exercised "guidance, management, direction or other exercise of control over the course" of the R Street Organization's activities, as required by this Circuit's *Yellow Bus Lines* decision. *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 954 (D.C.Cir. 1990) (en banc). Rather, the evidence showed that others in the Organization, notably Kevin Williams–Davis, directed Ms. Boyd's activities and that she did what she was told.

840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988), and *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988)). The Court gave extensive instructions that the jury was to consider each offense separately as to each defendant and not allow a verdict on any one defendant to influence its deliberations as to any other. *See* Tr. July 6, 1992, at 19, 36–37. The Court also instructed the jury that they were not to infer a particular defendant's guilt merely from the fact that the defendant was associated with other people who were guilty of wrongdoing. *See* Tr. July 6, 1992, at 36. Finally, the jury was provided with a separate verdict form for each defendant. These techniques, the Court believes, were sufficient to alleviate any prejudicial spillover effects that may have arisen from Ms. Boyd's joinder in trial with the other four co-defendants.

Accordingly, Ms. Boyd's Motion for New Trial, and/or Judgment of Acquittal, N.O.V., must be denied.

## IV. DEFENDANT DARRYL WILLIAMS'S MOTION TO DISMISS

Defendant Darryl Williams moves this Court to dismiss Counts 77 and 3 against him. Mr. Williams was convicted on both counts.

■ As to Count 77, the motion in essence asks the Court to reconsider its trial ruling that Counts 76 and 77 are not multiplicitous. *See* Tr. June 25, 1992, at 174–75; Tr. June 26, 1992, at 17. Both counts arise from a single course of conduct on June 5, 1990, as charged in the indictment. Count 76 charged Mr. Williams with distribution of "crack" cocaine on that date, while Count 77 charged him with possession with intent to distribute the same drugs. In denying Mr. Williams's motion to dismiss Count 77 as multiplicitous, the Court accepted the government's position that, while Counts 76 and 77 presented alternative theories of proof, the offenses would merge for the purposes of sentencing in the event the jury convicted on both (which occurred). *See* Tr. June 25, 1992, at 175. The Court believes this is still the correct approach. *See United States v. Phillips*, 664 F.2d 971, 1039 (5th Cir.1981) (citing *United States v. Hernandez*, 591 F.2d

1019, 1022 (5th Cir.1979) (en banc)), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Mr. Williams having failed to offer any new reason or evidence why this remedy is insufficient, the Court will deny his motion as to Count 77.

■ The motion for dismissal of Count 3, the drug conspiracy count, is an entirely different matter. Mr. Williams's argument is that a conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846 is a lesser included offense to the offense of operating a continuing criminal enterprise in violation of 21 U.S.C. § 848, as charged in Count 4, of which Mr. Williams was also convicted. Mr. Williams's brief suggests that, because CCE requires proof that he acted "in concert with five or more other persons," 21 U.S.C. § 848(c)(2)(A), which encompasses the agreement required to convict him of drug conspiracy, his § 848 conviction subsumes his conviction for violating § 846. *See Jeffers v. United States*, 432 U.S. 137, 148–50, 97 S.Ct. 2207, 2214–16, 53 L.Ed.2d 168 (1977). As a consequence, he argues, the Court must now dismiss Count 3 with prejudice.

This argument has considerable merit. It is true, as the government contends, that the Supreme Court has never squarely "held" that a § 846 drug conspiracy is a lesser included offense of a CCE when, as here, the same activities form the basis for each crime. *See id. But cf. United States v. Aguilar*, 849 F.2d 92, 98 (3d Cir.) (discussing Justice Blackmun's plurality opinion in *Jeffers* and noting that, while there was no "holding" on the lesser included issue, the plurality's assumption on the issue "was based upon a detailed rationale, including a close reading of the two statutes in question and a survey of the relevant legislative history underlying the CCE provision"), *cert. denied*, 498 U.S. 962, 111 S.Ct. 395, 112 L.Ed.2d 405 (1990). But it is no less true that every circuit, including the D.C. Circuit, has considered the same question and concluded that it is. *See United States v. Rivera–Martinez*, 931 F.2d 148, 152–53 (1st Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991); *United States v. Gonzales*, 866 F.2d 781, 786 (5th Cir.), *cert. denied*, 490 U.S. 1093, 109

S.Ct. 2438, 104 L.Ed.2d 994 (1989); *United States v. Moya–Gomez,* 860 F.2d 706, 752–54 (7th Cir.1988), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989); *United States v. Possick,* 849 F.2d 332, 341 (8th Cir.1988); *Aguilar,* 849 F.2d at 97–99; *United States v. Stallings,* 810 F.2d 973, 975–76 (10th Cir.1987); *United States v. Cruz,* 805 F.2d 1464, 1479 (11th Cir.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987), and *cert. denied,* 482 U.S. 930, 107 S.Ct. 3215, 96 L.Ed.2d 702 (1987); *United States v. Schuster,* 769 F.2d 337, 344–45 (6th Cir.1985), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1210, 89 L.Ed.2d 322 (1986); *United States v. Burt,* 765 F.2d 1364, 1368–69 (9th Cir.1985); *United States v. Mourad,* 729 F.2d 195, 202–03 (2d Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984), and *cert. denied,* 472 U.S. 1007, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985); *United States v. Smith,* 703 F.2d 627, 628 (D.C.Cir. 1983) (*per curiam* ).

Curiously, the government's opposition brief ignores the decisions of the courts of appeals on this subject. Instead, the government relies on *Garrett v. United States,* 471 U.S. 773, 785–86, 105 S.Ct. 2407, 2414–15, 85 L.Ed.2d 764 (1985), and *United States v. Harris,* 959 F.2d 246, 253–54 (D.C. Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 362, 121 L.Ed.2d 275 (1992), and *cert. denied,* —— U.S. ——, 113 S.Ct. 364, 121 L.Ed.2d 277 (1992). Neither case is controlling. The *Garrett* Court addressed "the relationship between *substantive* predicate offenses and a CCE" for purposes of double jeopardy analysis and held that Congress did not intend to forbid a jury from predicating a CCE conviction upon a prior conviction for a substantive drug offense. *Garrett,* 471 U.S. at 793, 794, 105 S.Ct. at 2418, 2419 (emphasis added). The last paragraph of that opinion, however, explicitly distinguished the situation, previously addressed by the Supreme Court in *Jeffers,* involving cumulative punishments for § 846 drug conspiracy and CCE. *See id.* at 794, 105 S.Ct. at 2419 (distinguishing *Jeffers,* 432 U.S. at 156–57, 97 S.Ct. at 2219–20); *see also Aguilar,* 849 F.2d at 98–99 (analyzing *Garrett* and *Jeffers* on this issue and concluding that the *Garrett* holding was limited to the relationship between substantive predi-

cate offenses and CCE); *Schuster,* 769 F.2d at 344 (same). Although our court of appeals in *Harris* held that a § 846 conspiracy could be a predicate *act* for a CCE violation, a careful reading of that opinion shows that the court did not have before it—and thus did not consider—the question Mr. Williams raises here: Whether a drug conspiracy in violation of § 846 is a lesser included offense to a CCE violation. Moreover, the *Harris* panel did not discuss, let alone question, the basis for the earlier *per curiam* decision in *Smith,* and so this Court must conclude that *Smith* remains good law in this circuit. *See* 703 F.2d at 628.

It is clear, therefore, that Mr. Williams's conviction for drug conspiracy merges with his conviction for operating a CCE. In such circumstances, this Circuit follows the majority view requiring that the conviction on the lesser charge be vacated and merged with the CCE. *See Rivera–Martinez,* 931 F.2d at 152–53 (concluding that the majority rule requires vacating the lesser conviction and sentence); *accord Smith,* 703 F.2d at 628 (trial court directed to vacate the conspiracy conviction and resentence the defendant). *But see Moya–Gomez,* 860 F.2d at 753–54 (collecting cases on this circuit split, including *United States v. Bond,* 847 F.2d 1233, 1239 (7th Cir.1988) and adopting the minority view permitting concurrent sentences for § 846 and § 848 convictions). The Court will accordingly do so. Although defendants Anthony Nugent and Kevin Williams–Davis have not joined in Mr. Williams's Motion, they are in identical positions to his. The Court, therefore, will vacate their convictions for drug conspiracy and merge those convictions with their CCE convictions as well.

Accordingly, Mr. Williams's Motion to Dismiss will be denied in part and granted in part.

. . . . . .

Thus, for the reasons stated in the opinion above, it is

ORDERED, that defendants' joint post-verdict Motion to Dismiss, Or in the Alternative, for New Trial is DENIED; and, it is

FURTHER ORDERED, that defendant Joyce W. Boyd's Motion for New Trial,

And/Or Judgment of Acquittal, N.O.V. is DENIED; and, it is

FURTHER ORDERED, that defendant Darryl D. Williams's Motion to Dismiss is DENIED IN PART AND GRANTED IN PART; and, it is

FURTHER ORDERED, that the convictions of defendants Darryl D. Williams, Anthony T. Nugent and Kevin F. Williams–Davis for conspiracy in violation of 21 U.S.C. § 846, as charged in Count 3 of the indictment, are VACATED and MERGED with their convictions for operating a continuing criminal enterprise in violation of 21 U.S.C. § 848 as charged in Count 4.

## APPENDIX A

Office of the

Probation Officer

United States District Court

for the District of Columbia

3rd and Constitution Avenue, N.W.

Washington, D.C. 20001–2866

Eugene Wesley, Jr.

Chief probation Officer

April 2, 1993

MEMORANDUM TO THE HONORABLE GEORGE H. REVERCOMB

RE: FAIRLEY, Janet B.

AKA: Janet Jellison

On March 31, 1993, the Court requested the assistance of the Probation Office in determining whether or not Ms. Fairley's conviction in Cumberland County District Court, Fayetteville, North Carolina, of Larceny by Trick was a misdemeanor or felony. Ms. Fairley was convicted of this offense on October 18, 1977.

In response to the Court's request, the U.S. Probation Office in Fayetteville, North Carolina was contacted. The Probation Office in that district reported that Cumberland County District Court does not have jurisdiction in felony matters. Additionally, they sent a fax transmittal indicating that North

Carolina general statutes were revised in 1979 and Larceny by Trick was repealed. Consequently, there are no North Carolina general statutes for the offense of Larceny by Trick at this time.

A copy of the North Carolina general statute 7A–272 which indicates that the District Courts only have original jurisdiction for matters which are below the grade of felony is attached. Although the NCIC record indicates that the defendant received a five year suspended sentence, based on the aforementioned information, the North Carolina Probation Office reports that this conviction is a misdemeanor.

Due to the fact that the conviction is approximately 15 years old, the Probation Office has been unable to obtain a copy of the Judgment and Commitment Order for this offense. However, the North Carolina Probation Office will continue researching this conviction and if any additional information is obtained, it will be forwarded to the Court.

Currently Ms. Fairley is on probation supervision in this office. On November 9, 1990, she was sentenced to four years probation, imposition of sentence suspended for the offense of Theft of Government Property, a class A misdemeanor. The Court ordered $37,858 restitution and 200 hours of community service. Ms. Fairley is in compliance with all conditions of probation. Probation supervision expires November 8, 1994.

Respectfully submitted,

/s/ Eugene Wesley, Jr.

Eugene Wesley, Jr.

Chief U.S. Probation Officer

Phone: 273-0106

EW:dlr

§ 7A–272. **Jurisdiction of district court.**

(a) Except as provided in this Article, the district court has exclusive, original jurisdiction for the trial of criminal actions, including municipal ordinance violations, below the grade of felony, and the same are hereby declared to be petty misdemeanors.

(b) The district court has jurisdiction to conduct preliminary examinations and to bind the accused over for trial upon waiver of

preliminary examination or upon a finding of probable cause, making appropriate orders as to bail or commitment. (1965, c. 310, s. 1.)

APPENDIX B

10TH STORY of Level 1 printed in FULL format.

Copyright 1992 The Washington Post

The Washington Post

July 24, 1992, Friday, Final Edition

SECTION: METRO; PAGE B1

LENGTH: 860 words

HEADLINE: Fear Said To Affect R St. Jury; Concerns Revealed As Panel Ends Work

SERIES: Occasional

BYLINE: Michael York, Linda Wheeler, Washington Post Staff Writers

BODY:

Several jurors in the trial of a D.C. drug gang known as the R Street Crew said yesterday they believe the verdict was influenced by fear of retaliation.

They also said that some jurors refused to convict on two racketeering counts because they believed—incorrectly—that those charges carried the heaviest penalties.

The seven jurors who held out for acquittal on the racketeering charges against the alleged members of the R Street Crew "were just plain scared for their personal safety," said Janet Jellison, the jury foreman. "It would have been better if we didn't have to deal with that. It was just too much."

Jellison, who said she believed the defendants were guilty of racketeering, did not elaborate on why she thought the other jurors were afraid.

Two of the six jurors interviewed said that fear of retaliation affected deliberations but that they were not fearful themselves. Two jurors said that there were concerns about safety but that they were unsure whether those fears had an impact on the jurors' votes. The other two jurors interviewed declined to discuss the safety concerns of the jury.

After a five-month trial and more than two weeks of deliberations, the jury completed its work yesterday. The jurors decided that the defendants should forfeit four luxury cars, a four-wheel drive truck, a house and $11,415 in cash as proceeds of an illegal drug operation.

On Tuesday, the jury had acquitted the five defendants of racketeering but convicted three of them of directing a drug organization and of using murder and violent assault to keep their drug conspiracy in place. The jury convicted the two other defendants on drug conspiracy charges.

Ironically, the racketeering acquittals made no difference in the prospective penalties. Three defendants, Kevin F. Williams–Davis, 28, Anthony T. Nugent, 27, and Darryl D. Williams, 24, were convicted of operating a continuing criminal enterprise, an offense that carries a mandatory sentence of life without parole.

Two other defendants, Alba D. Restrepo, 46, and Joyce Boyd, 39, were convicted of conspiring to distribute drugs and other drug offenses. Those convictions carry mandatory minimum sentences of 10 years, although federal sentencing guidelines could provide for minimum terms of at least 30 years.

Jellison, 35, said the jurors were deadlocked 7 to 5 for acquittal on the racketeering charges, brought under the Racketeer–Influenced and Corrupt Organizations Act.

Jellison and fellow juror Frank Garnett said the jury was well aware that this was the test case for using the act to prosecute street drug gangs. The law, devised as a tool to fight organized crime, has been used against other drug organizations, but this was the first case involving a street gang. A second such case, against the so-called P Street Crew, is scheduled for trial in October.

Jellison said she too was fearful when she realized the case involved an alleged gang that had been linked to several homicides, but she said she grew more comfortable as the trial moved on. Jellison said she lives in a neighborhood with drug trafficking prob-

lems, and she said her house and car have been burglarized in the past.

During the trial, Assistant U.S. Attorney Russell Duncan disclosed that threatening posters had appeared in the unit block of R Street NE, the base of the defendants' operations, and that some witnesses had received threats. There were no reports, however, of threats to jurors in the case.

The trial was held in Courtroom 10, which has a bulletproof glass wall separating the audience from the judge, lawyers and defendants.

Garnett, a postal employee, said he was surprised to learn that three defendants would receive life without parole. He said he, like other jurors, focused on the racketeering charges.

"We knew this was a first for Washington, D.C., and around the country," Garnett said. "I think they [the U.S. attorney's office] want to satisfy the public by bringing these street-level cases."

Although he understood that prosecution strategy, part of it disturbed him, Garnett said, because the government appeared more concerned with prosecuting the R Street defendants than their cocaine suppliers in Central America.

One alleged supplier, Restrepo, was among those convicted, but two others, Panamanian nationals Jaime and Guillermo Bynoe, once cooperated with the government and are now fugitives. Defense lawyers said during the trial that prosecutors allowed them to leave the country.

Garnett agreed: "They could have gone after them, but they let them go."

Much of the jury's 10 days of deliberations centered on the racketeering counts, and several jurors acknowledged that the sessions were heated but declined to elaborate.

Jellison said she already was familiar with federal racketeering laws, having written a paper for a course at George Washington University on the Mafia. She said that when she heard the government's evidence, she knew what was before them was a racketeering violation.

"What I saw was an ongoing criminal enterprise," she said. "They might not have been Mafia ... but I recognized it. I saw it."

TYPE: DC NEWS

SUBJECT: DISTRICT OF COLUMBIA; JURIES; THREATS; NARCOTIC AND DRUG VIOLATIONS; RACKETEERING

ORGANIZATION: R STREET CREW

NAMED–PERSONS: JANET JELLISON; ALBAD RESTREPO; JOYCE BOYD; KEVIN F. WILLIAMS–DAVIS; ANTHONY T. NUGENT; DARRYL D. WILLIAMS